Opinio by Judge GOULD; Partial Concurrence and Partial Dissent by Judge PAEZ.
OPINION
GOULD, Circuit Judge:
In this case we search for the proper balance between, on the one hand, the vibrant rights of free speech and assembly in an open society and, on the other hand, the needs of a city to maintain order and security. We consider the constitutionality of an emergency order prohibiting access to portions of downtown Seattle, Washington, during the 1999 World Trade Organization (WTO) conference. Appellants filed lawsuits in the United States District Court for the Western District of Washington seeking damages for the con *1118 stitutional rights that were alleged to be violated by the emergency order. Four of the Appellants also filed individual claims in which they alleged that their constitutional rights were infringed by Seattle police officers in the course of the conference. We determine that the emergency order was a constitutional time, place, and manner restriction on speech on its face, and we affirm the judgment of the district court on that issue. But we also determine that there are genuine issues of material fact whether the emergency order was constitutional as applied to certain Appellants, and we reverse and remand for trial on that issue. As for the Appellants’ individual claims, we affirm in part, reverse in part, and remand.
I
On October 2, 2000, Plaintiffs-Appellants Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, and Nicole Pearson (the Hankin plaintiffs)[1] filed suit against the City of Seattle, then-Seattle Mayor Paul Schell, and then-Seattle Police Chief Norman Stamper in the United States District Court for the Western District of Washington, on behalf of a class defined as:
All persons who were arrested by the City of Seattle and its police agents or its affiliated police agents on December 1 and 2, 1999, pursuant to the defendants’ “no protest” policies and directives which were eventually embodied by the City of Seattle’s Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) and who were subsequently not convicted of any crime. Included in this class are all persons arrested pursuant to such policies both inside and outside the zone established by Order Number 3.
The Hankin plaintiffs sought damages, alleging that defendants violated their rights under the United States Constitution. The Hankin plaintiffs also requested declaratory relief stating that the emergency order violated the United States Constitution.
On March 7, 2000, Victor Menotti, Thomas Sellman, Todd Stedl and Doug Skove (the Menotti plaintiffs) filed a lawsuit against the City of Seattle, Schell, Stamper, and Officer Michael Jennings and Detective Sharon Stevens of the Seattle Police Department.[2] The Menotti plaintiffs filed an amended complaint on January 9, 2002, adding Seattle Police Department Officer Ronald Smith as a defendant. The Menotti plaintiffs alleged that defendants violated their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and sought damages. Menotti and Sell-man also alleged that defendants committed false arrest.
The district court consolidated the two cases for the purpose of resolving legal issues common to all parties. On October 29, 2001, the district court granted the defendants’ motion for partial summary judgment regarding the constitutionality of the emergency order, holding that as applied it was a constitutional time, place, and manner restriction on speech. The district court concluded that the emergency order: (1) was content neutral in that it did not exclude speech based on content or viewpoint, (2) was narrowly tailored because it “covered only enough territory for the WTO delegates and the President [of the United States] to move safely from *1119 their hotels to the convention [center] and lasted only during the conference,” (3) served a significant government interest of maintaining order in an emergency situation, and (4) provided ample alternatives for expression because protestors could demonstrate just outside the boundaries of the restricted zone.
The district court denied the plaintiffs’ cross-motion for summary judgment on the constitutionality of the emergency order as applied. The district court also granted the City’s motion for summary judgment on the Hankin plaintiffs’ claims under 42 U.S.C. § 1983 alleging a failure to train or supervise officers, holding that the Hankin plaintiffs had not presented any evidence supporting this contention.
On January 8, 2002, the district court denied the Hankin plaintiffs’ motion for class certification. On August 29, 2002, the district court granted summary judgment to all defendants as to the Hankin plaintiffs’ remaining claims, based on the district court’s ruling of the constitutionality of the emergency order. The district court entered final judgment as to the. Hankin plaintiffs pursuant to Fed.R.Civ.P. 54(b) on November 5, 2002.
As for the lawsuit filed by the Menotti plaintiffs, the district court on November 1, 2001, denied the Menotti plaintiffs’ motion for partial summary judgment based on the alleged federal constitutional violations. On January 14, 2002, the district court, based on its ruling that the emergency order was constitutional, granted the defendants’ motion for summary judgment as to Sellman’s claims. However, the district court denied the defendants’ motion for summary judgment as to the claims of Skove and Stedl, finding that genuine issues of material fact existed as to the circumstances of their arrests.
On January 14, 2002, the district court also granted defendants’ motion to dismiss the Menotti plaintiffs’ claims against Schell and Stamper in their individual capacities, holding that the Menotti plaintiffs had not provided any evidence showing that Schell or Stamper were personally involved in the seizure or arrest of these plaintiffs.
On August 15, 2002, the district court granted Officer -Smith’s motion for summary judgment based on qualified immunity as to Skove’s claims. The district court determined that Smith was entitled to qualified immunity on Skove’s Fourth Amendment claim because Smith had acted reasonably, and further that Smith was entitled to qualified immunity on Skove’s First Amendment claim because no constitutional violation had occurred. The district court denied Skove’s cross-motion for summary judgment on the same claims.
Finally, on October 1, 2002, the district court granted summary judgment to the City on Menotti and Stedl’s claims under 42 U.S.C. § 1983, holding that there was probable cause to arrest Menotti, and that Menotti and Stedl had submitted no evidence of a municipal policy or custom of illegally seizing or searching handbags. The district court entered final judgment as to the Menotti plaintiffs on October 1, 2002.
The Menotti plaintiffs filed a timely notice of appeal on October 23, 2002. The Hankin plaintiffs filed a timely notice of appeal on November 13, 2002. We have jurisdiction under 28 -U.S.C. § 1291, and we affirm in part, reverse in part, and remand.
II
In reviewing de novo the district court’s grant of summary judgment, where the facts are disputed we view the evidence in the light most favorable to the non-moving party. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). We determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant *1120 substantive law. We do not weigh the evidence or determine the truth of disputed material facts, but determine only whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir.1999) (en banc).
The WTO is an international group comprised of member nations that discuss trade issues and enter into trade agreements.[3] In January 1999, the White House announced that the City of Seattle, Washington (the City) had been selected as the location for the first WTO conference to be held in the United States. The conference was to take place from November 30, 1999 to December 3, 1999. Representatives from the 134 WTO-member nations,[4] including the President of the United States, were to convene in Seattle.
Those who opposed the WTO’s agenda and specific activities convened in Seattle well in advance of the opening of the conference, and protest activity began taking place. Three weeks before the opening of the conference, unknown individuals broke windows at a Gap clothing store in downtown Seattle and threw several “Molotov cocktails”[5] into the building, causing substantial damage. The “anarchist”[6] symbol was spray-painted onto the walls of the Gap store and on the adjoining sidewalk. Other protestors attempted to gain entry into downtown Seattle offices of timber and forest product companies. Protestors trespassed onto downtown Seattle’s Old Navy store, and hung a huge protest banner on the face of the storefront. On November 26, 1999, the day after Thanksgiving, a group of fifty to sixty protestors entered a parade without permission to protest the WTO.
Protest activity began to intensify on November 29, 1999, one day ahead of the WTO conference. While most protestors were peaceful, others were violent. The level of violence cannot be considered de minimis and in some cases posed threats to persons.[7] Some protestors vandalized property by spray painting buildings and breaking windows. Others pounded on windows of downtown stores and threw *1121 rocks at police officers. Police formed a security perimeter around the Niketown store in downtown Seattle because of protestors encouraging a crowd to take over the store. Damage to property and risks to individuals on this day were not insignificant, though limited in geographic area to a few blocks in the center of the City, and protestors dispersed late into the evening.[8]
The WTO conference opened formally on November 30, 1999, and from law enforcement’s perspective, things got worse. Police logs indicate that demonstrators gathered in the downtown area as early as 5:45 a.m. At least some among the protestors had violent intentions. On a videotape introduced as part of the record, a masked protestor says, “50,000 people that really care.... I’m hoping that we can come out here, and get crazy and fucking up shit ..., that every city in the world knows that it can’t host the WTO conference and it better give control of the city back to the people or that city’s going to be torn to pieces.”
Those protestors who chose to use violence to disrupt the WTO’s conference used an array of weapons, devices, and tactics to obstruct the conference. The disruption of normal city life was so extreme in some locations that it bordered on chaos. Police officers in contemporaneous reports said that they saw protestors carrying bottles filled with flammable liquids, locking down intersections by forming human chains from lightpost to light-post, breaking windows at retail stores,[9] overrunning and looting small retail stores, and jumping on ears. By 8:00 a.m., protestors had cut off vehicular access to the Paramount Theater and the Washington State Convention & Trade Center, the primary meeting venues of the conference. After demonstrators were discovered inside meeting venues, police requested and received a “lock down”[10] of the Washington State Convention & Trade Center and the Sheraton Hotel, where many WTO delegates were staying.[11] Seattle Police De *1122 partment, The Seattle Police Department After Action Report, World Trade Organization Ministerial Conference, Apr. 4, 2000, at 36-39 [hereinafter “WTO After Action Report”].
Some protestors directed violence at law enforcement authorities: Among the violent, there were protestors who assaulted police officers with chemical irritants, and others who vandalized police cars. Some violent protestors threw metal spikes, cans, bottles, signs, empty gas canisters, and pieces of concrete at officers, who were forced to wear riot gear for protection. Other protestors deliberately disregarded police lines and attempted to break through in violent confrontations with police. According to a report of the Seattle City Council prepared after the WTO convention, “officers were put in perilous situations where, often cut off from communication, they were expected to endure physical assaults and taunts for long periods without food, rest, restrooms, or water.” Seattle City Council, Report of the WTO Accountability Review Committee, Sept. 14, 2000, at 5 [hereinafter “ARC Report”]. Some officers were “violently barragéd with ball bearings (‘pachinko’ balls), rocks and bottles,[and] squirted with urine.” Id. at 10 & n. 14. One police officer on duty suffered a heart attack, and a helicopter evacuation was required because medical units could not break through the gathered crowd to provide medical assistance.
Some officers did not take the passive resistance approach in response to being targeted by violence, and mutual insecurity among police and protestors caused the situation to spiral out of control. In lieu of large-scale arrests, some officers responded with tear gas and similar non-lethal weapons like pepper gas, beanbag guns, and rubber bullets. Id. at 4. The gravity of the situation caused some officers to resort to measures characterized later by the City Council as “out of proportion to the threats faced,” provoking further disturbance and resistance from violent protestors.[12] Id. at 4, 11.
The general public was also at risk. Some violent protestors started fires in the streets and in large dumpsters, and then protestors prevented fire trucks from entering the area. A driver of a garbage truck was pulled from his vehicle and assaulted in the core downtown area. Once police were overwhelmed, some uses of non-lethal weapons, such as chemical irritants, failed to discern law-abiding demonstrators and bystanders from the lawbreakers they were intended to disperse. Not only dignitaries from many nations *1123 worldwide with interest in the WTO’s trade conference, but also, regrettably, panic, confusion, and chaos were visiting Seattle.
Some protestors even directly interfered with WTO delegates in an effort to disrupt the progress of the conference. Some violent protestors held, pushed, or tackled WTO delegates to prevent their entry into conference venues. Some WTO delegates were forcibly prevented from leaving conference venues. Some violent protestors stopped one delegate’s car and punctured its tires. Reflecting the extreme dangers to delegates, protestors, and the public, at least one WTO delegate drew a gun in response to the protestors’ attempts to detain him, requiring immediate police intervention.
Some violent protestors were well-organized, and their actions were coordinated. Some protestors gathered intelligence about police operations during the protest by asking officers questions about law enforcement tactics. Other protestors listened in on squad briefings taking place on city streets. Still others used cellular telephones and “walkie-talkies” to coordinate protestors’ activities.[13] By one account, Seattle’s streets turned into “seeming war zones.” ARC Report at 4. It is perplexing how our dissenting colleague can rely on the City Council’s report, with its acknowledgment of the “war zone” atmosphere in Seattle, and still urge the violence was not pervasive; although the ARC Report suggests that violent protestors were less than one percent of the total protestors, this is not a small amount of violence given the activities in which the protestors engaged, and where there were tens of thousands of protestors.
Despite the gravity of these problems, not all protest was violent or disruptive. Much protest activity was ordered and reasonable. Several marches involving primarily peaceful protestors took place in the downtown area on November 30, 1999. These marches, comprised of concerned persons who were not violent and who were not breaking the law, caused the inflow of tens of thousands of persons into downtown Seattle. The largest protest of the day, a march organized by the AFL-CIO, was estimated by police to have involved 40,000 persons. Other protest marches involving significant numbers of persons included a march of about 1000 members of the Sierra Club, a march of 500 students from the University of Washington, and a march of 1000 protestors from the Tibetan Rights Association. These marches by non-violent protestors showed the substantial public sentiment opposing the WTO or its activities. Protests such as these are the positive fruits of an open society, and encourage us to scrutinize with care the constitutional issues raised by city and police responses to the breakdown of civic order and security caused by violent protestors seeking to disrupt the WTO conference.[14]
As noted by the Seattle Police Department’s WTO After Action Report, these largely peaceful demonstrations took place *1124 amid the chaos and disruption caused by the violent protestors. The report also specified that the combination of heightened security measures required for WTO delegates and the large number of protestors rendered police unable effectively to make individual arrests of those protestors who were breaking the law. The report stated:
This was a pattern that occurred throughout the conference and presented significant tactical challenges to police commanders. The protestors were establishing a fluid, dynamic method of operation that consisted of rapid deployment and the use of non-criminal protestors to buffer smaller pockets of protestors engaging in significant criminal acts.
WTO After Action Report at 35. One Seattle police captain’s report noted that officers “heard and saw numerous incidents of property destruction, burglary, and looting; but we were unable to leave our lines to take enforcement actions.”
At about 3:30 p.m. on November 30, 1999, then-Seattle Mayor Paul Schell declared a civil emergency in the City of Seattle, pursuant to Seattle Municipal Code Section 10.02. The Mayor also imposed a general curfew. The governor of the State of Washington then authorized the deployment of, and called out, the National Guard.[15]
President Clinton arrived at the Westin Hotel in downtown Seattle between 1:30 a.m. and 2:30 a.m. on December 1, 1999. A few hours after the President’s arrival, when protest activity had temporarily subsided, Mayor Schell signed “Local Proclamation of Civil Emergency Order Number 3” (Order No. 3). Order No. 3 said, in pertinent part:
WHEREAS, the Mayor declared a civil emergency exists in the City of Seattle (“the City”) in the Proclamation Dated November 30,1999; and
WHEREAS, after the issuance of the Proclamation and despite the deployment of hundreds of law enforcement officers, the City continued to experience civil disturbances resulting in injury to persons and damage to property; and-
WHEREAS, the level of city disturbances and danger to persons and property has been highest in those areas in which there are protests in the vicinity of World Trade Organization (“WTO”) meetings; and
WHEREAS, the City understands its obligations to permit expressive activity pursuant to reasonable time, place and manner restrictions necessitated by the existing public safety concerns for WTO delegates, dignitaries, citizens, public safety employees and protestors; and
WHEREAS, the Chief of Police and other public safety officials have determined that the safety of WTO delegates, dignitaries, citizens, public safety employees and protestors cannot be preserved without reasonably limiting access to areas used by WTO personnel; and
WHEREAS, it is imminently necessary to use extraordinary measures to protect the public peace, safety and welfare; and
WHEREAS, the civil emergency necessitates the utilization of emergency powers granted to the Mayor pursuant to *1125 Seattle Municipal Code, Chapter 10.02 and [Wash. Rev.Code] Chapter 38.52. Therefore ....
A limited curfew is imposed in the portion of the City within the following boundaries: Starting on the corner of 4th Avenue and Lenora Street, then proceeding south on 4th Avenue to Seneca Street, then east on Seneca Street to the 1-5 freeway, then north along the 1-5 freeway to Boren Avenue, then north on Boren Avenue to Pine Street, then west on Pine Street to 6th Avenue, then north on 6th Avenue to Lenora Street, then west on Lenora Street to, and concluding at 4th Avenue and Lenora, as shown on the attached map.
The effect of Order No. 3 was that all persons, subject to limited exceptions, were prohibited from entering the portion of downtown Seattle described in the order. The exceptions to the prohibition on entering the restricted zone were granted for: (1) delegates and personnel authorized by the WTO to participate in official WTO functions; (2) employees and owners of businesses within the restricted area and other personnel necessary to the operation of those businesses; and (3) emergency and public safety personnel.[16] Violations of Order No. 3 were punishable by a fíne of not more than $500 and/or imprisonment of not more than 180 days. At all times, the Washington State Convention & Trade Center and the Paramount Theater were within the restricted zone, as well as the major hotels where WTO delegates were staying (i.e., the Four Seasons Hotel, Cavanaughs, and the Sheraton Hotel). The restricted zone skirted these venues, and in substance provided a protective perimeter.[17]
In the early morning hours of December 1, 1999, Seattle Assistant Chief of Police Harv Ferguson issued an “Operations Order” to implement Order No. 3 and the restricted zone. The Operations Order told officers that “[vjehicles and/or pedestrians .,. are authorized access inside the [restricted zone] if they have a reasonable purpose for entering the perimeter. A reasonable purpose includes work, shopping at a specific location within the [restricted zone], or other like type reasonable activity.” Thus, as it was interpreted, Order No. 3 excluded all persons except delegates and personnel authorized by the WTO for its official functions, employees and owners of businesses within the restricted area, their customers, other personnel necessary to the operation of those businesses, and emergency and public safety personnel. Initially, Order No. 3 had not explicitly permitted shoppers to enter, but it had allowed business owners and persons necessary to run their businesses to enter, which implicitly supported the interpretation of the Operations Order.
At a press conference on the morning of December 1, 1999, Assistant Seattle Police Chief Edward Joiner[18] explained the City’s adoption of Order No. 3:
We’re going to adopt a policy that’s pretty much in line with what’s done in other cities around the world when they have an event of this magnitude, and that is, to take the core area where the [WTO] conference is occurring ... and prohibit any demonstrations within that core area for the remainder of the week.
*1126 Seattle Police Captain James Pugel testified in deposition[19] that Assistant Chief Joiner had instructed him, in connection with the implementation of Order No. 3 and the Operations Order, “[n]o large protests. No people can come marching through [the restricted zone]. There will be no marches.” ■ •
Chief Stamper - testified in deposition[20] that the effect of the Operations Order was to exclude protestors from entering the restricted zone:
From the officer’s point of view, we have made it clear that we could not permit large groups to gather to block intersections and so forth, and from their point of view what they’re thinking and what they believe is their direction is to make sure that nobody comes into that, into the so-called no-protest zone unless he or she is there to shop or has legitimate business purpose in the downtown area, so from their point of view it effectively meant anybody coming in to protest.
Order No. 3 and the accompanying Operations Order decreased violence and protest within the restricted zone. But it did not stop either violence or protest within the restricted zone. Inside the restricted zone, protestors gathered in open defiance of Order No. 3, and police made about 300 arrests.[21]
President Clinton addressed the WTO conference on December 1, 1999, and departed the next morning. There was no violence immediately incident to his presentation. On December 2, 1999, Mayor Schell amended Order No. 3 by reducing the size of the restricted zone. As modified, the restricted zone was reduced to exclude the Westin Hotel because President Clinton had since departed.[22] Police logs indicate that protest violence decreased on December 2, 1999, and through the conclusion of the WTO conference on December 3, 1999. Order No. 3 expired at 7:00 a.m. on the morning of December 4, 1999.
In opposition to the City’s motion for summary judgment, plaintiff-appellant Kenneth Hankin submitted a declaration stating that he was arrested for violating Order No. 3 by trespassing inside the restricted zone with the purpose of protest. Hankin testified via declaration that, on the morning of December 1, 1999, he and others participated in a group protest that began in Denny Park, north of downtown Seattle and outside the restricted zone. As their group approached Westlake Park, a downtown shopping plaza and public square within the restricted zone, Seattle police surrounded them. The group responded by sitting on the ground. Hankin testified that, without warning, Seattle police arrested the group of protestors, and then turned to another portion of Westlake Park, where Hankin was standing. Han-kin and others beside him were arrested.
*1127 Victor Menotti submitted his deposition testimony in support of his motion for partial summary judgment.[23] Menotti testified that he was a credentialed participant in the WTO conference and that, on December 1, 1999, he was standing on a sidewalk talking with a small group about a WTO conference meeting he had just attended. Without warning, police charged the group surrounding Menotti. Menotti ran, believing that police were trying to disperse the crowd, but stopped when he realized he was being pursued. Menotti was arrested for pedestrian interference and obstructing an officer; however, the charges against Menotti were dismissed before a probable cause hearing was held.
Thomas Sellman also introduced his deposition testimony and that of Seattle Police Detective Sharon Stevens in support of his motion for partial summary judgment. Sellman testified that he was within the restricted zone on December 1, 1999, distributing leaflets containing a cartoon criticizing the WTO. Stevens testified that she and another officer witnessed Sellman distributing the flyers and asked Sellman what business he had in the zone. When Stevens ascertained that Sellman did not come within one of the exceptions to Order No. 3, Stevens ordered him to leave the restricted zone. When Sellman attempted to hand out another flyer, Stevens placed him under arrest for failing to disperse. Sellman spent two nights in jail and was released thereafter.
Todd Stedl presented deposition testimony in support of his motion for partial summary judgment. Stedl testified that, after hearing about Order No. 3 on December 1, 1999, he decided to enter the restricted zone and distribute leaflets containing the text of the First Amendment. While standing just outside the zone, Stedl tried to hand a leaflet to an officer, who reacted by grabbing the fliers and searching Stedl’s bag. When Stedl complained that the officer could not seize his fliers or search his bag without a warrant, the officer told him to contact City Hall and to leave the restricted zone. Stedl asked for the officer’s badge number, and the officer told Stedl to leave. The officer later approached Stedl again and told him to leave the area. Stedl told the officer that he thought he already was outside the zone. The officer replied that Stedl should get going. When Stedl asked how far, the officer told him fifteen blocks. Stedl testified that he was too intimidated to return to the zone to pass out more leaflets, and felt that if he had returned, he would be arrested. The officer was never identified.
Doug Skove introduced his deposition testimony and video evidence in support of his motion for partial summary judgment. Skove testified that, on December 2, 1999, he decided to go to Seattle after hearing about the restricted zone. He carried a sign that read on one side, “Is the WTO in control of Seattle too?” and on the other side “I have the right to protest nonviolently.” The video evidence shows that a police officer (later identified as Seattle Police Officer Eonald Smith) saw Skove carrying the sign as Skove walked into a crosswalk. Smith said to Skove, “Hey, what did the Mayor tell you? Other side of Fourth, other side of Seneca.”[24] As *1128 Skove finished crossing the street, Smith approached, grabbed Skove’s sign and pulled it away from his hands. Skove turned to his right and continued walking across the street and away from Smith, while Smith shouted “Come here, hey pal!” Skove continued walking away. Smith said, “That’s alright, that’s okay,” as Smith walked away, folded Skove’s sign, and threw it away. After Skove had another encounter with police where a second sign was seized, Skove was warned he would be arrested if he continued protesting. Skove left the restricted zone.
Ill
The Hankin and Menotti plaintiffs contend that Order No. 3 was an unconstitutional time, place, and manner restriction on its face, and the Menotti plaintiffs also contend that Order No. 3 unconstitutionally conferred unfettered police discretion for its implementation. The Hankin plaintiffs also contend that Order No. 3 was unconstitutional as applied to them because the City had adopted a policy of arresting only anti-WTO protestors within the restricted zone.[25]
A
We first address the facial constitutionality of Order No. 3. We have held that “[a]n ordinance is facially unconstitutional if (1) it is unconstitutional in every conceivable application because it is vague or impermissibly restricts a protected activity or (2) it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.” Vlasak v. Superior Court, 329 F.3d 683, 688 (9th Cir.2003) (internal quotation marks and citation omitted). The Supreme Court has held that “particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute’s plainly legitimate sweep.” Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The Hankin plaintiffs contend that Order No. 3 was facially unconstitutional because it was overbroad. In evaluating this overbreadth challenge, we determine whether Order No. 3’s restrictions on speech were content neutral, were narrowly tailored to serve a significant governmental interest, and left open ample alternative means of communication. Vlasak, 329 F.3d at 689; see also Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).
1
We address first whether Order No. 3 was content neutral. “The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.” Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The reason for this rule is to protect and preserve free and unfettered speech for the ultimate good of society. We have expressed this basic reason in varied ways, but it is unassailable that the “fundamental principle” behind content analysis is that “government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial *1129 views.” City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48-49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (internal quotation marks and citation omitted). In assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of hidden motive; rather, we look at the literal command of the restraint. Stated another way, we agree with Justice Kennedy’s observation in City of Los Angeles v. Alameda Books, Inc., that “whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based.” 535 U.S. 425, 448, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (Kennedy, J., concurring). Our circuit has adopted this view. Ctr. for Fair Pub. Policy v. Maricopa County, 336 F.3d 1153, 1164 (9th Cir.2003).
Applying these principles here, we see Order No. 3 as content neutral on its face. Even when we credit plaintiffs’ evidence and give plaintiffs all reasonable inferences, the text of Order No. 3 is not in dispute, and it does not favor one content over another. The purpose of enacting Order No. 3 had everything to do with the need to restore and maintain civic order, and nothing to do with the content of Appellants’ message. See United States v. Griefen, 200 F.3d 1256, 1260 (9th Cir.2000) (“[A] restriction on expressive activity is content-neutral if it is justified, i.e., based on a non-pretextual reason divorced from the content of the message attempted to be conveyed.”). As a matter of law, Order No. 3 was not a regulation of speech content, but rather was “a regulation of the places where some speech may occur.” See Hill v. Colorado, 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Under Order No. 3, persons could not protest — in support of or against — any topic within the restricted zone. Id. (holding that restrictions are not content based where they “apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech”) (internal quotation marks and citation omitted). The restricted zone established by Order No. 3 applied equally to persons of all viewpoints. That Order No. 3 predominantly affected protestors with anti-WTO views did not render it content based. See Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (“[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.”).
Further, the City’s evidence in testimony of Mayor Schell,[26] Police Chief Stamper,[27] and Assistant Chief Joiner[28] *1130 was that the City did not implement Order No. 3 because of disagreement with the message of anti-WTO protestors. Instead, the motivating factor in. the adoption of Order No. 3, as stated in its text, was the City’s observation that “the level of civil disturbances and danger to persons and property ha[d] been highest in those areas in which there [were] protests in the vicinity of [WTO] meetings,” and the need to ensure the safety of WTO delegates as well as downtown residents and workers. The plaintiffs did not submit evidence controverting the text of Order No. 3, which is not in dispute, or contradicting the purposes recited by the Mayor and police chief.[29]
Appellants contend that Order No. 3 was content based because it permitted exemptions for shoppers and downtown workers to enter the restricted zone. We reject this argument because these exemptions did not enable the City to discriminate against ideas it disfavored. See One World One Family Now v. City and County of Honolulu, 76 F.3d 1009, 1012 n. 5 (9th Cir.1996) (“Because these exemptions don’t enable the city to discriminate against ideas it disfavors, they don’t render the ordinance content-based.”). The exemptions permitted shoppers and downtown workers to go about their business in the restricted zone and did not enable the City to discriminate against any persons on the basis of their views. Further, there is no evidence that those persons who were permitted to enter the restricted zone were part of the security problem that prompted the adoption of Order No. 3. See Hill, 530 U.S. at 723, 120 S.Ct. 2480 (“[A] statute that restricts certain categories of speech only lends itself to invidious use if there is a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute’s scope, while others fall inside.”).
We hold that Order No. 3 was content neutral, and proceed to address the other factors necessary for a reasonable time, place, and manner restriction.[30]
2
We next assess whether Order No. 3 was narrowly tailored to serve a significant governmental interest. The Supreme Court has held that “[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the ‘evil’ it seeks to remedy.” Frisby, 487 U.S. at 485, 108 S.Ct. 2495. To be narrowly tailored, a statute “need not be the least restrictive means of furthering [the government’s] interests, but the restriction *1131 may not burden substantially more speech than necessary to further the interests.” United States v. Baugh, 187 F.3d 1037, 1043 (9th Cir.1999). However, “the First Amendment demands that municipalities provide ‘tangible evidence’ that speech-restrictive regulations are ‘necessary’ to advance the proffered interest in public safety.” Edwards v. City of Coeur d’Alene, 262 F.3d 856, 863 (9th Cir.2001). The tailoring of the restraint must of course correspond to the purposes it serves. Ward, 491 U.S. at 799, 109 S.Ct. 2746 (holding that the narrowly tailored requirement is satisfied “so long as the [neutral] regulation promotes a substantial government interest that would be achieved less effectively absent the regulation”) (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).[31]
Applying the rule of Ward and its standard here, we return to the issue of whether Order No. 3 was narrowly tailored to serve a significant government interest. No one could seriously dispute that the government has a significant interest in maintaining public order; indeed this is a core duty that the government owes its citizens.[32] The Supreme Court has declared that “[i]t is a traditional exercise of the States’ police powers to protect the health and safety of their citizens.” Hill, 530 U.S. at 715, 120 S.Ct. 2480 (internal quotation marks and citation omitted); see also Edwards, 262 F.3d at 863; One World One Family Now, 76 F.3d at 1013. In the face of violent riot, the City had a duty to restore order and to ensure the safety of WTO delegates and the residents of Seattle.[33] The City also had an interest in seeing that the WTO delegates had the *1132 opportunity to conduct their business at the chosen venue for the conference; a city that failed to achieve this interest would not soon have the chance to host another important international meeting.[34]
The Appellants nonetheless contend that the safety net cast by the City was too broad, and that it restricted protest unduly in too large of an area, and thus wasn’t narrowly tailored.[35] We turn to these contentions.
Here, the City had a tough problem. Violent protestors were damaging the City and jeopardizing the progress of the WTO conference. Yet violent protestors were breaking the law amidst throngs of lawful protestors. In this setting, per evidence that is not materially in dispute, large numbers of non-violent protestors prevented police from curbing effectively the activities of the violent protestors.[36] Police reports said that “[t]he protestors were establishing a fluid, dynamic method of operation that consisted of rapid deployment and the use of non-criminal protestors to buffer smaller pockets of protestors engaging in significant criminal acts.” WTO After Action Report at 35. The violent protestors damaged the City and disrupted the WTO conference, but they were able to elude capture due to the tens of thousands of non-violent protestors in the downtown area. The implementation of Order No. 3 was necessary to permit police to restore and then to maintain order and safety in downtown Seattle, for WTO conference delegates and the public, and to allow officers to execute their law enforcement duties by arresting those breaking the law.[37]
*1133 Citing the Supreme Court’s decision in Madsen, as well as our decisions in Baugh and Bay Area Peace Navy v. United States, 914 F.2d 1224 (9th Cir.1990), Appellants contend that there are cases invalidating restricted protest zones that were smaller in scope than the restricted zone implemented by Order No. 3. This argument misapprehends the case law and ignores the factual circumstances of this case. None of these cases establish a per se rule on the boundaries that a city may draw in creating a restricted zone during protest activities. Further, none of these cases dealt with the factual circumstances presented here: a small but dedicated group of violent protestors who inflicted disruption and destruction on city streets and threatened the safety of world leaders, while obscured and sheltered by about 50,000 peaceful protestors, all within a concentrated portion of a metropolitan downtown area. We decline Appellants’ invitation to interpret the above cases as defining conclusively the appropriate scope of “narrow tailoring” in the context of establishing a buffer zone on protest activity.[38]
Appellants’ contention that the large size of the restricted zone rendered it constitutionally impermissible ignores significant considerations that confronted City officials. As seen from the diagram of the restricted zone, the various hotels and meeting venues of the WTO conference were spread out across several blocks of downtown Seattle. The size of the restricted zone cannot sensibly be evaluated without considering the size of the area in which delegates were housed and had to move freely in order to do the work of the WTO conference. To achieve the goal of providing secure protection for WTO delegates and ensuring safe transit for delegates between venues and hotels, the City crafted the restricted zone as being bounded by the outermost venues of the conference and the hotels where delegates were staying.[39] As the district court saw it, “the *1134 [restricted] zone covered only enough territory for the WTO delegates and the President to move safely from their hotels to the [WTO] convention and lasted only during the conference.”[40] We conclude the district court’s, analysis of this issue was sound and in accord with law.
We also reject Appellants’ contention that the size of the restricted zone enforced by Order No. 3 was an overreaction that needlessly restricted the rights of peaceful protestors. In the context of a massive demonstration with tens of thousands of participants, once a pattern of chaotic violence had been established, it was unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions. In this regard, the Supreme Court’s decision in Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), has particular application. In Hill, the Court upheld a Colorado law that made it unlawful for any person within 100 feet of an abortion clinic knowingly to approach within eight feet of another person without that person’s consent to provide materials or counseling. The Court reasoned:
[ T]he [restricted zone’s] prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary. Such individualized characterization of each individual movement is often difficult to make accurately. A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself.
Id. at 729, 120 S.Ct. 2480.
Here, the size of the restricted zone was justified by the difficulty of protecting world leaders in an environment in which a small group of violent protestors were determined to cause chaos and to disrupt the conference proceedings midst tens of thousands of non-violent protestors.[41] In dif *1135 ferent circumstances, it might be possible for law enforcement authorities, on an individualized basis, to distinguish between peaceful protestors and those with violent intentions. But in these circumstances, after the broad antagonism to the WTO had ripened into pervasive illegal and violent disruptive actions, it would not have been practical to require police, on a continuing basis, to make an accurate determination of each protestor as violent or not violent. Appellants also argue that police should have had more extensive staffing on the street so that they could permit protestors to enter anywhere and simply arrest and remove those who violated the law.[42] But we should hesitate to say that the law requires such a solution in an emergency situation like that here where law-breaking and law-abiding protestors were often indistinguishable, and where those abiding the law might have interfered indirectly with enforcement against violent protestors.
Appellants contend that Collins v. Jordan, 110 F.3d 1363 (9th Cir.1996), controls the outcome of this case. We disagree. In Collins, the Mayor of San Francisco responded to sporadic violent protests by directing police officers to “cause the dispersal and prevent the continuation of any gatherings of people anywhere in the City and County of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property.” Id. at 1367. We affirmed the district court’s denial óf qualified immunity to the officers, because “it was clear at that time, as it is today, that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter).”[43] Id. at 1372. *1136 However, we said in Collins that our holding was narrow:
We need not address the question of whether at some point — for example if there is widespread continuing violence that appears to be beyond the ability of the police to control — a time-limited ban on all demonstrations might be lawful. Similarly, we need not decide whether, and under what circumstances, specific, reliable information that organized violence of a serious nature is about to occur might justify a determination that a clear and present danger exists warranting the banning of a particular demonstration.
Id. at 1373.
The scope of the violence that plagued Seattle on November 30, 1999, and the clear and present risks to world leaders attending the WTO conference, render Collins inapposite. In Collins, the violence that San Francisco faced before it restricted protest was much less severe than Seattle faced in this ease. Further, San Francisco restricted speech throughout the whole county,[44] while Seattle merely restricted access within a well-defined security zone to facilitate a public event.[45]
*1137 Mass demonstrations involving tens of thousands of participants are an important form of political protest and have a great pedigree. Consider Martin Luther King, Jr.’s march on Washington, at which he delivered the “I Have a Dream” speech to a crowd of over 250,000 on the Washington Mall. When a crowd is generally peaceful, large protests do not necessarily create risks to public safety and security, even though the crowd must be managed by a city. But once multiple instances of violence erupt, with a breakdown in social order, a city must act vigorously, and more extensively, to restore order for all of its residents and visitors. Adding large numbers of police on the street might be the solution in some cases, but in. other cases could lead to more intense violence. In light of the City’s significant governmental interest in restoring and maintaining civic order to the core downtown area, Order No. 3 and the restricted zone it implemented were narrowly tailored.[46]
While it is plausible that Order No. 3 was not the least restrictive means of achieving the City’s goal, that is not what Supreme Court precedent requires. There is no question that the governmental interest here (security of the core downtown area) would have been achieved less effectively absent Order No. 3. Our role here is not to inject ourselves into the methods of policing, and-we do not do so here. Albertini, 472 U.S. at 689, 105 S.Ct. 2897 (holding that the validity of a regulation “does not turn on a judge’s agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant .government interests”). We conclude that Order No. 3 was narrowly tailored to achieve a significant governmental interest.[47]
*1138 3
We must also assess whether Order No. 3 left ample alternative channels of communication. We have observed that “[t]he Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting.” Ctr. for Fair Pub. Policy, 336 F.3d at 1170 (quoting Colacurcio v. City of Kent, 163 F.3d 545, 555 (9th Cir.1998)). A time, place, and manner restriction does not violate the First Amendment “simply because there is some imaginable alternative that might be less burdensome on speech.” Albertini, 472 U.S. at 689, 105 S.Ct. 2897. “Of course, the First Amendment does not guarantee the right to communicate one’s views at all times and places or in any manner that may be desired.” Bay Area Peace Navy, 914 F.2d at 1229 (quoting Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). However, an “alternative mode of communication may be constitutionally inadequate if the speaker’s ‘ability to communicate effectively is threatened.’ ” Id. (quoting Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. 2118).
The application of these principles presents a very difficult question. On the one hand, the restricted zone carved out a portion of the downtown area where protestors could not deliver their message directly to delegates. On the other hand, the protestors were able to demonstrate and express their views immediately outside the restricted zone, including areas directly across the street from the Washington State Convention & Trade Center and the Paramount Theater. The scope of the restriction on protest extended only to the bounds of the restricted zone, and did not apply generally to the City of Seattle. The protestors could reasonably expect their protest to be visible and audible to delegates, even if not as proximate as the protestors might have liked.[48]
Given the protestors’ ability to communicate directly across the street from most WTO venues, and given the violence that Order No. 3 was aimed at preventing, we think the better analysis favors the conclusion that Order No. 3 provided ample alternatives for communication. See Hill, 530 U.S. at 729, 120 S.Ct. 2480 (“Signs, pictures, and voice itself can cross an 8-foot gap with ease.”). Appellants argue that they were prevented from communicating with WTO delegates at close range, but there is no authority suggesting that protestors have an absolute right to protest at any time and at any place, or in any *1139 manner of their choosing. Bl(a)ck Tea Soc’y v. City Of Boston, 378 F.3d 8, 14 (1st Cir.2004) (“[Although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators’ ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.”).[49]
We do not minimize the value to society of facilitating protest communications. Justice Brandéis in Whitney v. California gave us a classic statement on the values of free speech:
[The Founding Fathers] believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.
274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), overruled by Brandenburg v. Ohio, 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Chief Justice Hughes reinforced these ideas a decade later in De Jonge v. Oregon:
The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.
299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937). The Supreme Court over dec-adés has never departed from this commitment to First Amendment values.[50]
Perhaps it has not been said with more elegance than in these words of Justice *1140 Brennan in the landmark decision of New York Times Co. v. Sullivan: “[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.” 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[51] However, we do not think that even the most vital First Amendment expressions — and for purposes of our analysis we consider political protest adverse to WTO activities and internationalist philosophy to be political comment at the core of the First Amendment — can be said automatically to overcome the need of a city to maintain order and security for its residents and visitors, in the face of violence. Burson v. Freeman, 504 U.S. 191, 197, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (“At the same time, however, expressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used.... [T]he government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.”).
Accordingly, we apply the ample alternatives test with a practical recognition of the dire facts confronting the City in the early morning hours of December 1 during the WTO conference.[52] On the evening of the first day of the WTO conference, and shortly before President Clinton was scheduled to arrive, Seattle was tense, its streets were in disarray from a long day of violent protest, and there was a general disruption of civic order. The “ample alternatives” cannot be taken to mean that each protestor has the right to convey his or her message in the manner preferred by that protestor — that would be impossible where, as in this case, protestors numbered in the tens of thousands. The City was required to take action to protect President Clinton and the delegates throughout the three re *1141 maining days of the conference. If the City had permitted chaos and violence to continue unabated, it would not merely lose its standing as a host city for international conferences, the City might also have sacrificed the safety of the delegates and of its residents. The permissible communications available to protestors under Order No. 3 were substantial, not perfunctory. These available communications, including protesting on the periphery of the restricted zone, were perhaps not ideal for protestors who wanted to present views in the face of delegates,[53] but neither did they wholly exclude protestors from the delegates’ purview.
In the “ample alternatives” context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a “reasonable opportunity” for communication. City of Renton, 475 U.S. at 54, 106 S.Ct. 925 (“[T]he First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city....”). We hold that, because Order No. 3 allowed protestors to demonstrate directly across the street from the Washington State Convention & Trade Center, the Paramount Theater, three out of four major hotels where WTO delegates were staying, and throughout the rest of downtown Seattle, Order No. 3 provided ample alternative channels of communication.[54] We recognize that our *1142 decision takes into account a balance of the competing considerations of expression and order. But we do not think the Constitution requires otherwise.[55]
We hold that Order No. 3 was a constitutional time, place, and manner restriction on speech on its face.[56] Because we *1143 hold that Order No. 3 was a valid time, place, and manner restriction,[57] we need not reach Appellants’ contention that Order No. 3 was a prior restraint. Baugh, 187 F.3d at 1042 (“[E]ven prior restraints may be imposed if they amount to reasonable time, place, and manner restrictions on speech.”).[58]
B
Appellants contend that Order No. 3 (and Assistant Chief Ferguson’s Operations Order) improperly gave unfettered discretion to officers charged with enforcing the Order. The Supreme Court has required that “a time, place, and manner regulation contain adequate standards to guide the official’s decision and render it subject to effective judicial review.” Thomas v. Chicago Park Dist., 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). A regulation granting unfettered discretion to officials charged with administering that regulation is impermissible because it creates two dangers. First, such a regulation may “intimidate[ ] parties into censoring their own speech, even if the discretion and power are never actually abused.” City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.E d.2d 771 (1988); see also Griefen, 200 F.3d at 1262. Second, unfettered discretion may permit the administering officials “to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the, activity in question on the ‘welfare,’ ‘decency,’ or ‘morals’ of the community.” Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); see also Griefen, 200 F.3d at 1262.
We addressed this issue in Griefen. There, the Forest Service had issued a closure order excluding the public from coming within 150 feet of a portion of the Nez Perce National Forest that was closed for construction and repair. Griefen, 200 F.3d at 1258. The closure order had exempted persons with a permit authorizing entry, law enforcement officials, rescue workers, and employees of the construction company doing work in the restricted zone. Id. Appellants challenged the closure order contending, inter alia, that the Forest Service had too much discretion in administering the closure order. Id. at 1262. We rejected this contention, explaining that “[i]f a closure of a public forum is for a valid rather than a disguised impermissible purpose, the potential for self-imposed or government censorship ... does not exist.” Id. We held:
*1144 In First Amendment terms, the fact that discretion to authorize entry to a closed area may be unfettered during construction is of no concern. The process of granting authority to enter a lawfully closed zone differs markedly from the process of licensing expressive activity. Such a process does not “engender identifiable risks to free expression....”
Id. at 1263 (quoting City of Lakewood, 486 U.S. at 757, 108 S.Ct. 2138).
Griefen is instructive in evaluating how Order No. 3 was implemented through the Operations Order.[59] We have determined that, on its face, Order No. 3 was a lawful time, place, and manner restriction on speech.[60] Thus, portions of downtown Seattle covered by Order No. 3 were lawfully closed with limited exceptions for public safety officials, business owners, managers, or employees, and their customers.
That officers had discretion to permit persons with a reasonable purpose to enter the restricted zone does not render Order No. 3 constitutionally deficient.[61] Order No. 3 facially restrained officers from excluding certain persons specifically authorized to enter the restricted zone, and the Operations Order clarified the phrase “reasonable purpose” specifically to in- *1145 elude “work, shopping at a specific location , or other like type reasonable activity.” We have upheld a grant of official discretion to interpret what is “reasonable” in restricting speech to further a significant government interest. See S. Oregon Barter Fair v. Jackson County, 372 F.3d 1128, 1139-41 (9th Cir.2004) (rejecting an unfettered discretion argument where the statute gave a governing body power to “charge permit applicants a fee reasonably calculated to reimburse the county for its reasonable and necessary costs in receiving, processing and reviewing applications for permits to hold outdoor mass gatherings” (emphases added)). Should a pattern of abuse result from an official’s exercise of discretion, the proper remedy is not to “insistí ] upon a degree of rigidity that is found in few legal arrangements,” but rather is to seek remedy through as-applied challenges. Chicago Park Dist., 534 U.S. at 325, 122 S.Ct. 775; S. Oregon Barter Fair, 372 F.3d at 1139.
Persons intending to protest were limited in time, place, and manner of their speech, but were not intimidated into censoring their speech because all protest activity was prohibited for a valid purpose in the restricted zone and speech was not restrained immediately, outside the restricted zone. Further, there was no danger on the face of Order No. 3 that officers enforcing the restricted zone could indiscriminately withhold permission to speak. Order No. .3 prohibited protest on any topic within the restricted zone. Order No. 3 and the supplemental Operations Order did not give officers administering the Orders discretion to allow persons with “favored” views inside the zone and to exclude those with “disfavored” views. Regardless of topic or viewpoint, protestors were prohibited from the restricted zone, as were others who did not fall within the limited exceptions.
Assistant Chief Joiner’s Operation Order gave officers guidance (including specific examples) of which individuals were permitted into the restricted zone.[62] The Operations Order said, “[vjehicles and/or pedestrians ... are authorized access inside the perimeter if they have a reasonable purpose for entering the perimeter. A reasonable purpose includes work, shopping at a specific location within the perimeter, or other like type reasonable activity.”[63] As in Chicago Park District, *1146 “[t]hese grounds [were] reasonably specific and objective, and [did] not leave the decision to the whim of the administrator.” 534 U.S. at 324, 122 S.Ct. 775 (internal quotation marks and citation omitted); see also S. Oregon Barter Fair, 372 F.3d at 1132; cf. Gaudiya Vaishnava Soc’y v. City and County of San Francisco, 952 F.2d 1059, 1065-66 (9th Cir.1991) (“The ordinance [violates the First Amendment because it] provides no specific grounds for granting or denying permits: no explicit limits are placed on the Chief of Police’s discretion.”). We hold that Order No. 3 and the Operations Order did not provide unfettered discretion to officers who were administering the restricted zone.
C
We next address the plaintiffs’ contention that Order No. 3 was unconstitutional “as applied.” “An as-applied challenge alleges that the restriction on speech is unconstitutional as applied to the litigant’s particular speech activity, even though the law may be capable of valid application to others.” Kuba v. 1-A Agric. Ass’n, 387 F.3d 850, 852, 856, slip op. 14635, 14645 (9th Cir.2004) (internal quotation marks omitted) (quoting Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir.1998)).[64] The district court concluded that Order No. 3 as applied to the Hankin plaintiffs was a valid time, place, and manner restriction. The Hankin plaintiffs contend that Order No. 3 was unconstitutional as applied to them because the City had adopted a policy of arresting only anti-WTO protestors within the restricted zone.
Hankin submitted a declaration in opposition to the City’s motion for summary judgment in which he testified that, on December 1, 1999, he participated in a group march and protest at Westlake Park within the restricted zone. Hankin testified that police surrounded the group and arrested them without any warning, and without any determination as to whether those persons were within the exemptions to Order No. 3. Hankin testified that, immediately after arresting the large group of protestors Seattle police then turned to another portion of Westlake Park, where Hankin was standing, and arrested him and others beside him without determining whether these persons came within the exemptions to Order No. 3. Accepting Hankin’s declaration testimony as true, as we must for the purposes of reviewing the district court’s grant of *1147 summary judgment to the City, Hankin’s testimony is evidence that the arrest of this group of persons was a “discriminatory enforcement of a speech restriction amount[ing] to viewpoint discrimination in violation of the First Amendment.” Foti, 146 F.3d at 635; see also Police Dept. v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating, on Equal Protection grounds, a disorderly conduct ordinance which barred picketing within 150 feet of a school in session, but exempted peaceful picketing of any school involved in a labor dispute, because “the operative distinction is the message on a picket sign”).
The City may be held liable for such a violation only if the arresting officers’ conduct was a product of City policy or custom. Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 691-694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As we have explained: “Liability may attach to a municipality only where the municipality itself causes the constitutional violation through ‘execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.’ ” Ulrich v. City and County of San Francisco, 308 F.3d 968, 984 (9th Cir.2002) (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018). A municipal “policy” exists when “a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to- the subject matter in question.” Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); Fairley v. Luman, 281 F.3d 913, 918 (9th Cir.2002) (per curiam).
There are three ways to show a policy or custom of a municipality: (1) by showing “a longstanding practice or custom which constitutes the ‘standard operating procedure’ of the local government entity;” (2) “by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;” or (3) “by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.” Ulrich, 308 F.3d at 984-85 (internal quotation marks and citations omitted). We have held that a municipal policy “may .be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.” Nadell v. Las Vegas Metro. Police Dept., 268 F.3d 924, 929 (9th Cir.2001) (internal quotation marks and citation omitted).
Although Schell (as then-Mayor of the City) was the City’s chief policymaker at the time Order No. 3 was implemented, he testified in deposition that he had “relied on the [police] officers to carry out [Order No. 3] and make sure we had a secure zone for our — for the safety of our citizens and the safety of the delegates.” Thus, Schell can be said to have “delegated that authority to ... a subordinate,” in this case, Police Chief Stamper. See Ulrich, 308 F.3d at 985. Chief Stamper, in turn, delegated the responsibility of planning the City’s response to the WTO protests to Assistant Chief Joiner. Joiner, in explaining the City’s implementation of Order No. 3, said that: ‘We’re going ... to take the core area where the [WTO] conference is occurring ... and prohibit any demonstrations within that core area for the remainder of the week.”
In support of their contention that the City had adopted a policy of suppressing anti-WTO speech in applying Order No. 3, the Hankin plaintiffs submitted declarations[65] from persons stating that police refused to allow them to enter the restriet- *1148 ed zone, even though they came within one of the exceptions to Order No. 3, unless they removed anti-WTO buttons or stickers.[66] Martha Ehman testified in a declaration that on December 1, 1999, officers enforcing the restricted zone permitted her to enter after she said that she was going to work in the restricted zone. She testified that, after being permitted to enter, officers told her to stop and remove a piece of tape from her backpack that had the words “NO WTO” on it, and that officers told her she would be arrested if she did not comply. Ehman removed the tape and was allowed to proceed. Lauren Holloway testified in a declaration that, on December 1, 1999, officers enforcing the restricted zone forcibly removed anti-WTO stickers from her clothing on the basis that she was in the “No Protest Zone.” Ronald Matyjas testified that, on December 1, 1999, while walking to his office located in the restricted zone, an officer told him that he could not wear the “No WTO” sign that he had affixed to his jacket, and that another officer tore off the sign without permission. Andrew Russell testified that, on December 1, 1999, he was refused entry into the restricted zone because he was wearing a button that said “No WTO,” and only after removing the button was he was allowed into the restricted zone. Rita Herkal testified that, on December 1,1999, officers forcibly removed anti-WTO stickers from her clothing, and that officers told her “You’re not allowed to wear stickers.”
The statements of Assistant Chief Joiner and the declarants, taken in the light most favorable to Appellants, create a genuine issue of material fact as to whether it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors. Viewing the evidence in the light most favorable to the Hankin plaintiffs, such a policy may be inferred due to the “widespread practices or evidence of repeated constitutional violations” and the absence of evidence that police officers were discharged or reprimanded for making the discard of anti-WTO expressive materials an entry ticket to the restricted zone. See Nadell, 268 F.3d at 929 (internal quotation marks and citation omitted). We reverse the district court’s grant of summary judgment to the City on the constitutionality of Order No. 3 as applied to the Hankin plaintiffs, and we remand this issue for trial. Because we so hold, we reverse the district court’s order denying class certification and remand that issue to the district court for reconsideration.[67]
*1149 However, we affirm the grant of summary judgment to individual defendants Schell and Stamper regarding the Hankin plaintiffs’ claims against them. “Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made,' or for conduct that showed a reckless or callous indifference to the rights of others.” Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir.1991) (internal punctuation, quotation marks, and citations omitted). Here, Appellants have presented no evidence, other than the adoption of Order No. 3 and the Operations Order, that either Schell or Stamper personally took part in the alleged constitutional violations or caused the constitutional violations through their individual actions. We have already held Order No. 3 to be facially constitutional, and without evidence that Schell and Stamper personally played a role in the alleged constitutional violations, either directly or by acquiescence or culpable indifference, there is no basis for liability against them in their individual capacities. The evidence presented by the plaintiffs was not sufficient to establish or create a genuine issue of material fact concerning the supervisory liability of Schell or Stamper.
IV
A
We turn to the individual claims of the Menotti plaintiffs. With regard to Menotti, the district court concluded that Seattle police had probable cause to believe Menotti had committed the crime of pedestrian interference[68] and obstructing a police officer.[69] The district court granted summary judgment on Menotti’s Fourth Amendment claim and state law false arrest claim. The district court also granted summary judgment to the City on Menotti’s First Amendment claim, holding that Menotti had failed to present evidence that the officers who arrested Menotti acted under a City policy. Menotti appeals the district court’s grant of summary judgment to the City and denial of his motion for summary judgment on these issues.
We first address whether the police had probable cause for Menotti’s arrest. “The test for probable cause is whether facts and circumstances within the officers’ knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.” United States v. Puerta, 982 F.2d 1297, 1300 (9th Cir.1992) (internal punctuation, quotation marks, and citatidn omitted). The question presented on Menotti’s Fourth Amendment claim is whether a prudent person in the position of the *1150 officers who arrested Menotti would have believed that Menotti was committing the offenses of pedestrian interference and obstructing an officer.
Menotti submitted video evidence showing that just before his arrest Menotti addressed a small group while pedestrians unaffiliated with the group walked by unimpeded. This evidence is contradicted by the deposition testimony of Seattle Police Officer Christopher Myers, one of the officers who arrested Menotti, who testified that he saw Menotti “causing a group to block both vehicular and pedestrian traffic.” We, of course, are not empowered to make factual determinations when faced with conflicting evidence. In this procedural context, where summary judgment was given to the City, we must credit the video evidence submitted by Menotti, and consider all evidence in the light most favorable to Menotti. Menotti’s video evidence showed that neither he nor the group he addressed interfered at all with pedestrians, and a reasonable jury could find from this evidence, if the jury failed to credit Officer Myers’s testimony, that the officers did not have probable cause to arrest Menotti. A genuine issue of material fact concerning whether pedestrians were impeded by Menotti exists, and requires trial for resolution. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
We also hold that a genuine issue of material fact exists as to whether police had probable cause to arrest Menotti for obstructing an officer. Menotti testified in deposition that when officers approached his group, the officers issued no directives or warnings, and that he ran because the officers wanted the group to disperse. Similarly, the video evidence submitted by Menotti does not show any obvious audible warnings by police immediately before Menotti’s arrest. In contrast, Officer Myers testified in deposition that, when officers approached Menotti’s group, they yelled “stop, police,” and that Menotti started running immediately thereafter. Whatever may be decided by the trier of fact, at the summary judgment stage we must credit Menotti’s testimony and conclude that a reasonable jury could determine that there was not probable cause to arrest Menotti for obstructing an officer. A genuine issue of material fact exists whether there was probable cause to arrest Menotti for obstructing an officer, and this issue also must be resolved by trial.
We hold that the district court erred by granting summary judgment for the City on Menotti’s Fourth Amendment claim. We reverse the district court’s grant of summary judgment dismissing Menotti’s § 1983 claim under the Fourth Amendment and his state law false arrest claim. We remand these claims to the district court for further proceedings.
We turn to Menotti’s First Amendment claim. Menotti alleged in his complaint that the City violated his First Amendment rights when officers arrested him. The district court granted summary judgment to the City, reasoning that Menotti “failed to produce sufficiently probative evidence of any City policy or custom that caused a deprivation of his constitutional rights.” Based on our ruling above that there is a genuine issue of material fact whether the City had a policy during the WTO conference of suppressing anti-WTO views of persons who might otherwise have qualified for entry into the restricted zone, we reverse the district court’s judgment on this issue and remand it to the district court for trial.
B
Sellman was arrested for distributing leaflets within the restricted zone, and the viability of his claims depends entirely on the resolution of his constitutional challenge to Order No. 3. Sellman presented *1151 no evidence that he was targeted for arrest because of his anti-WTO views. Rather, the undisputed testimony revealed that Sellman was arrested only after Detective Stevens ascertained that Sellman had violated Order No. 3 by being in the restricted zone when he did not come within one of its exceptions, and further that Sellman did not obey an order to disperse. We affirm the district court’s grant of summary judgment in favor of defendants on Sellman’s claims.[70]
C
Stedl testified in deposition that his bag was unlawfully searched and his fliers unlawfully seized by an unidentified officer. Stedl contended that the City was liable, based on 42 U.S.C. § 1983, for an unlawful search and seizure. The district court granted summary judgment for the City on Stedl’s claim, holding that Stedl had not presented evidence of a City policy to commit unlawful seizures. As we have already explained, to prevail on a theory of municipal liability, Stedl must show that the unidentified officer acted pursuant to an official policy or custom of the City. Monell, 436 U.S. at 691-694, 98 S.Ct. 2018; Ulrich, 308 F.3d at 984.
There was no evidence of any City policy authorizing the search of backpacks or the seizure of fliers. Stedl argues that such a policy may be inferred from an alleged pattern of such practices by officers during the WTO conference, but he offered deposition testimony of only two persons, himself and one other protestor, who said that police had unlawfully searched their bags. Even viewing the evidence in the light most favorable to Stedl, he has not offered evidence proving the first method of satisfying Monell’s policy requirement: there was not evidence of a “longstanding practice or custom which constitutes the ‘standard operating procedure’ of the local government entity.” Ulrich, 308 F.3d at 984 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Similarly, Stedl didn’t show “that [the unidentified officer] was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision.” Id. at 985 (internal quotation marks omitted). Nor did Stedl’s evidence establish that “an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.” Id. A showing of constitutional wrong by a single police officer may support a claim against that officer, but a claim against a municipality may proceed only with evidence that the officer acted under the municipality’s policy or custom. Here, Stedl did not show that the unidentified officer acted under an official policy or custom of the City.
We affirm the district court’s summary judgment in favor of the City on Stedl’s claims.
D
Skove brought First Amendment and Fourth Amendment claims against Officer *1152 Smith for Smith’s seizure of Skove’s sign.[71] The district court concluded that Smith was entitled to qualified immunity on Skove’s Fourth Amendment claim because Smith had probable cause to believe that Skove had committed a crime (violating Order No. 3), and because the seizure involved exigent circumstances. The district court also granted summary judgment to Smith on Skove’s First Amendment claim, holding that Smith’s actions were a valid time, place, and manner restriction on speech. Skove appeals the district court’s grant of summary judgment to Smith on both claims.
We review the district court’s grant of qualified immunity de novo. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Under Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), we take a two-step approach in determining whether Smith is entitled to qualified immunity. First, we determine whether Smith violated Skove’s constitutional right. Id. at 200-01, 121 S.Ct. 2151. If we answer in the affirmative, we proceed to determine whether that right was “clearly established” such that “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Id. at 201-02, 121 S.Ct. 2151. If we determine at the first step that there was no constitutional violation, that ends the qualified immunity inquiry. Id.
We address Skove’s Fourth Amendment claim and consider whether Smith violated Skove’s constitutional rights by seizing Skove’s sign. Under the Fourth Amendment, the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV. The Supreme Court has held that “in the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless ... accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause.” Illinois v. McArthur, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (internal quotation marks omitted). However, when faced with “special law enforcement needs,” the Supreme Court “has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.”[72] Id.
*1153 Smith contends that his seizure of Skove’s sign was lawful because Smith had probable cause to arrest Skove for being in the restricted zone and not within Order No. 3’s exemptions. We agree that Smith had probable cause to arrest Skove because, by engaging in protest inside the restricted zone without evidence that he was exempt, Skove had violated Order No. 3. However, it is uncontested that Smith did not arrest Skove. Had Skove been arrested, ample precedent would permit a search or seizure “incident to arrest.” Knowles v. Iowa, 525 U.S. 113, 116-17, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (noting that the two historical rationales for the search incident to arrest exception are “(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial”). We decline to extend the doctrine of “search incident to arrest” to give protection for a warrantless search or seizure when no arrest is made. It may be that Officer Smith declined to arrest Skove because Skove walked away and Officer Smith decided to maintain his post. Whatever Officer Smith’s reason for not making the arrest, the seizure cannot be justified as incident to an arrest. Had an arrest been made, Smith could argue the sign was seized as evidence, McArthur, 531 U.S. at 331-32, 121 S.Ct. 946, but without an arrest, we do not see how Smith legitimately could be concerned about a need to preserve evidence of a crime from being destroyed.[73]
There is some merit to the argument that where there is probable cause to arrest, evidence of the crime may be seized and the seizure considered valid even if the arrest is not completed. See Roaden v. Kentucky, 413 U.S. 496, 504, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1974) (recognizing that “the probable cause for an arrest might justify the seizure of weapons, or other evidence or instruments of a crime, without a warrant”). A supporting reason would be that police in some settings might have to disregard competing duties to pursue and complete an arrest where, as here, a suspect walks away. Yet, we reject this position because, if police aims to arrest are so weak that they do not detain a suspect, then it seems incongruous to say that a seizure of evidence can be lawfully made without a warrant. We decline to extend the exception to warrant requirements for seizures incident to arrest to instances in which a police officer seizes evidence of a crime, but makes no arrest.
Viewing the evidence in the light most favorable to Skove, as we must in reviewing the district court’s grant of summary judgment to Smith based on qualified immunity, when Smith encountered Skove there was no exigency requiring seizure of Skove’s sign without a warrant. When the encounter took place on December 2, 1999, Seattle police had met with tens of thousands of non-violent and violent protestors who had inflicted severe damage on the downtown, which led to the City’s promulgation of Order No. 3. The City’s law enforcement resources (and officers themselves) had been taxed severely. But Smith faced a relatively calm situation at the point and time he encountered Skove on December 2. The City did not present evidence that Smith was dealing with violent protestors when he encountered Skove. By contrast, Smith’s deposition testimony indicated that, just before *1154 he saw Skove, Smith was talking with a fellow officer and “taking in the atmosphere.” Viewing the evidence in the light most favorable to Skove, Smith when seizing Skove’s sign was not then actively engaged in preventing others from entering the restricted zone, nor was he immediately engaged in combating violence. In fact, Skove submitted video evidence that, in the light most favorable to Skove, shows that others were not immediately present and the circumstances were not exigent when Smith confronted Skove and seized his sign.
We also decline to establish a general exception to the Fourth Amendment’s warrant requirement for conduct that, absent special needs consistent with the Supreme Court’s precedents, is asserted to be “reasonable.” It has long and consistently been the law that exceptions to the warrant requirement preceding searches and seizures are for defined categorical circumstances. See McArthur, 531 U.S. at 330-31, 121 S.Ct. 946 (listing examples of exceptions to the warrant requirement). Because an arrest was not made, and no established exception justifies the warrant-less seizure on undisputed facts, we conclude that there is a genuine issue of material fact bearing on exigency and whether Smith’s seizure of Skove’s sign violated the Fourth Amendment’s protection against unreasonable seizures.
We proceed to the second step of qualified immunity analysis, under which we must determine whether the right was clearly established. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. We have held:
Whether a right is “clearly established” for purposes of qualified immunity is an inquiry that must be undertaken in light of the specific context of the case, not as a broad general proposition. In other words, “[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.”
Graves v. City of Coeur D’Alene, 339 F.3d 828, 846 (9th Cir.2003) (quoting Saucier, 533 U.S. at 201-02, 121 S.Ct. 2151) (alteration in original).
The question before us then becomes whether a reasonable officer in Smith’s position would have understood that he could not lawfully seize Skove’s sign absent an arrest of Skove or exigent circumstances. We have rejected the position that a seizure could be made based on probable cause to arrest, when the arrest was not completed. Moreover, viewing the evidence in the light most favorable to Skove, we cannot say that the circumstances were indisputably exigent at the time and place Officer Smith confronted Skove and seized his sign. Because the exceptions to the Fourth Amendment’s warrant requirement have been categorically defined, and because “in the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment ... unless ... accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause,” McArthur, 531 U.S. 326, 330-31, 121 S.Ct. 946, 148 L.Ed.2d 838 (internal quotation marks omitted), we hold that a reasonable officer in Smith’s position would have understood that his warrantless seizure of Skove’s sign without an arrest and without exigency offended the guarantees of the Fourth Amendment. We therefore reverse the district court’s grant of qualified immunity to Smith on Skove’s Fourth Amendment claim.[74]
*1155 As for Skove’s First Amendment claim against Smith, we determine that the district court properly granted summary judgment to Smith. To prevail on his First Amendment claim, Skove must provide evidence showing that Smith “deterred or chilled [Skove’s] political speech and such deterrence was a substantial or motivating factor in [Smith’s] conduct.” Sloman v. Tadlock, 21 F.3d 1462, 1469 (9th Cir.1994). Smith testified in deposition that he approached Skove and seized Skove’s sign because Skove was engaged in protest, an activity Smith knew to be prohibited by Order No. 3. Skove submitted no evidence to the district court to establish that Smith’s actions were motivated by opposition to Skove’s political beliefs or that Smith’s actions were motivated by a desire to chill Skove’s speech. Viewing the evidence in the light most favorable to Skove, we conclude that the district court properly granted summary judgment to Smith on Skove’s First Amendment claim, and we affirm the district court on this issue.
E
We reverse the district court’s grant of summary judgment to the City on Menotti’s Fourth Amendment and false arrest claims and remand those claims for trial. We also reverse the district court’s grant of qualified immunity to Officer Smith, and remand for trial the issue of Smith’s liability for the seizure of Skove’s sign. We affirm the district court’s dismissal of all other claims asserted by Menotti, Sellman, Stedl, and Skove.
V
Justice Stewart once observed for the Supreme Court, in no uncertain terms, that “[t]he guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.” Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (quoting Adderley v. Florida, 385 U.S. 39, 47-48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)).[75] When a city is charged with the critically important responsibility of hosting a convention of world leaders, a setting in which the eyes of the world are on the city and our country, and our nation’s reputation is at stake as well, the city must have the power to maintain civic order in a responsible way that does not unduly interfere with the gathered convention or with civil liberties. In balancing desired freedom of expression and the need for civic order, to accommodate both of these essential values, a measure of discretion necessarily must be permitted to a city, on the scene with direct knowledge, to fashion remedies to restore order once lost. It may be that a violent subset of protestors who disrupt civic order will by their actions impair the scope and manner of how law-abiding protestors are able to present their views.
*1156 Given the breakdown of public order that confronted Seattle, we decline to hold unconstitutional the City’s implementation of procedures necessary to restore safety and security to its residents and to the visiting world leaders. As occurred in this case, a city hosting an important meeting may be besieged with tens of thousands of persons, some with lawful intentions in the best tradition of civic protest, but others with violent and disruptive aims. When violent protestors substantially disrupt civic order, there must necessarily be consequences for all if a city is to satisfy its superordinate duty to provide safety and security. While respecting the liberty of protestors, a city must be permitted to act reasonably, within the bounds of the Constitution, to fulfill its responsibilities of providing physical security and the maintenance of order that is required for all of a city’s residents and visitors.
We reject the facial challenges to Order No. 3, as well as the general challenge to police discretion implementing it under the Operations Order. In most respects, and particularly in regard to the permissibility of the City’s adoption of Order No. 3 and its accompanying Operations Order, we affirm the judgment of the district court. However, as explained above, viewing the evidence in the light most favorable to Appellants, in some instances police conduct may have gone too far and infringed certain individual protestors’ constitutional rights by making the content of their expressed views the test for their entry into the restricted zone. We reverse and remand to the district court the Hankin plaintiffs’ as-applied challenge to Order No. 3, as well as the issue of class certification. We also reverse and remand to the district court identified issues regarding the arrest of Menotti and the seizure of Skove’s personal property. On the record before us, we conclude that trial of disputed facts is necessary on the claims for which we reverse and remand.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
*1157 [[Image here]]
*1158 [[Image here]]

. Robert Hickey, Carroll Jackson, and Emily Maloney were also named plaintiffs in the lawsuit, but they are not parties to this appeal.

. Andrew Russell, Lauren Holloway, and Ronald Matyjas were also plaintiffs in the lawsuit, but they are not part of this appeal. Officer Jennings is also not part of this appeal.

. The WTO was established on January 1, 1995, during the Uruguay Round negotiations held pursuant to the General Agreement on Tariffs and Trade. According to its web site, the WTO "is the only global international organization dealing with the rules of trade between nations. At its heart are the WTO agreements, negotiated and signed by the bulk of the world's trading nations and ratified in their parliaments. The goal is to help producers of goods and services, exporters, and importers conduct their business.” What is the WTO?, at http://www.wto.org/en-glish/thewto_e/whatis_e/whatis_e.htm (last visited Oct. 7, 2004). The WTO's objectives have generated a vigorous opposition by those who believe that the WTO "favor[s] trade expansion over all else.” Lynda Gorov, The Varied Foes of WTO Unite in Seattle Protests, Boston Globe, Nov. 30, 1999, at Al.

. As of the filing date of this Opinion, the .WTO has 148 member nations.

. A "Molotov cocktail” is an explosive device consisting of "a bottle, gasoline, and a rag.” United States v. Simmons, 83 F.3d 686, 687 (4th Cir.1996).

. "The anarchist movement represents a range of groups, from organized and primarily nonviolent groups like the Industrial Workers of the World to loosely knit and more extremist splinter groups....” Ruth Tei-chroeb, Fringe Anarchists in Middle of Violent Demonstrations, Seattle Post-Intelligencer, Dec. 1, 1999, at A15. The "anarchist” symbol consists of the letter “A” in a circle, and the symbol "is one of the most familiar symbols of anarchism and represents the slogan 'Anarchy Is Order.' " Id.

. The dissent, while acknowledging that violence occurred, argues that our "account exaggerates its pervasiveness” because most protestors were peaceful. Dissent at 1160. We of course explicitly recognize that "most protestors were peaceful,” but this does not negate the harsh reality and striking import of the widespread violence instigated by those protestors who were not peaceful. Moreover, *1121 the description of the WTO riots that follows is not just that of the majority. The whole world witnessed the rampant violence and chaos in the streets of Seattle at the outset of the WTO meeting. The dissent's account misapprehends reality by minimizing the violence and its import. Any fair and objective review of the record would lead to the conclusion that District Judge Barbara J. Rothstein’s order granting summary judgment to the City correctly described an emergency situation marked by pervasive vandalism, theft, arson, and assault that overwhelmed law enforcement resources. These acts of violence are undisputed in the record before us. One may disagree on the legal implications of the violence under First Amendment doctrine, and doubtless we and the dissent do so disagree. But to minimize the violence and threat to the City, to visiting foreign dignitaries, and to Seattle’s citizens, as our dissenting colleague does, is wrong.

.Appellants have not alleged a negligence cause of action against the City for having advance notice of but failing to prevent the chaos that stemmed from the violence that marred the WTO conference. However, the pattern of protest propagating civil disorder and violence is relevant to understanding the City’s interest in restoring and maintaining order to allow the WTO conference to proceed securely. Our dissenting colleague fails to give this interest adequate heed.

. Niketown, the site of protest on the prior day, again attracted the attention of violent protestors. Officers received reports that Niketown was being ransacked by protestors, and the officers had to rescue employees through a rear alley door.

. A "lock down" of these facilities meant that no persons could enter or exit.

. The increased level of protection for delegates was necessary for their security. It also was even more important because WTO meeting venues had been designated the equivalents of foreign embassies, mandating heightened security protection.

. The dissent focuses on the Seattle Police Department for its response, finding significance in the City Council's remark that officers "likely intensified the situation.” Dissent at 1161. The dissent's characterization is incorrect as a description of police conduct as a whole, and in any event is irrelevant to the analysis of Order No. 3’s constitutionality. The City Council’s ARC Report acknowledges that "police officers on the front lines had no basis for confidence that the violence would stop with rocks and bottles,” and the report "thankfully endorses the performance of those officers who underwent unnecessary hardship and were the victims of poor planning and leadership in the field.” ARC Report at 4, 10. Moreover, whether Order No. 3 comports with the First Amendment does not turn on who is to blame for the intensity of the situation that the City faced. See discussion infra Part III. Whatever the complex of causes, the City was faced with riots and disorder beyond its control that threatened the safety of visiting foreign officials, prompting Order No. 3, and its permissibility must be assessed in light of the crisis facing the City when it was adopted. Finally, it is also likely that most of the time when police attempt to quiet a violent disturbance the situation is intensified, which is a collateral consequence of law enforcement’s response to violent protest.

. On the previous day, a protestor on a bicycle rode ahead of a group of protestors, communicating to the crowd via radio the locations of police officers.

. The dissent's characterization of the decision to enact Order No. 3 as following the realization that the “crowd was simply larger than the police had anticipated” again ignores the violence and riot that threatened the WTO conference. It misapprehends the extent of disorder and insecurity caused by the large crowd: The police “were not going to be able to bring the situation under control without taking some sort of drastic action,” and "the only recourse” they had was to "establish the police perimeter” to "provide security for the delegates.” See Dissent at 1160.

. The dissent chastises the City for poor planning driven by political and cost considerations. Dissent at 1161. This condemnation does not control whether Order No. 3 comports with the First Amendment. Our analysis properly focuses on the City's chosen means ■ to restore order once lost to violent protestors bent on preventing the WTO conference from proceeding. See discussion infra Part III.A.2.

. In an amendment to Order No. 3 issued later that day, additional exemptions were granted for city staff and credentialed members of the press.

. We attach as Appendix A a diagram of the boundaries of the restricted zone that was part of the record in this case.

.Chief Stamper had delegated -to Assistant Chief Joiner the task of planning the Seattle Police Department’s response to the WTO conference.

. The Menotti plaintiffs submitted Captain Pugel’s deposition testimony in support of their motion for partial summary judgment and in opposition to the City's motion for partial summary judgment.

. The Menotti plaintiffs submitted Chief Stamper’s deposition testimony in support of their motion for partial summary judgment and in opposition to the City's motion for partial summary judgment.

. Even outside the restricted zone, there were some problems of violence incidental to protest. Some violent protestors caused property damage, threw debris, blocked tire street, and trapped people in their cars. Some protestors jumped onto an officer's patrol car and shook it by its light bar, while others laid in front of the car and prevented the officer from escaping. Some protestors took over the fuel pumps at a gas station and attempted to fill small bottles with gasoline.

.We attach as Appendix B a diagram of the revised boundaries of the restricted zone that was part of the record in this case.

. We consider these depositions because they were part of the record when the district court granted summary judgment to the defendants on the Menotti plaintiffs' claims. Fed.R.Civ.P. 56(c) (stating that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to' any material fact and that the moving party is entitled to a judgment as a matter of law”).

. This was an instruction from Smith to Skove to exit the confines of the restricted zone.

. "A facial challenge alleges that any enforcement of the ordinance creates an unacceptable risk of the suppression of ideas. An as-applied challenge alleges that the restriction on speech is unconstitutional as applied to the litigant’s particular speech activity, even though the law may be capable of valid application to others.” Kuba v. 1-A Agric. Ass’n, 387 F.3d 850, 856 (9th Cir.2004) (internal quotation marks and citation omitted).

. Schell testified in deposition that a “secure zone” was his “primary objective” in enacting Order No. 3, and that the advice he received from his staff was that a "secure zone" was necessary in order to assure the safety of downtown residents and WTO delegates.

. Stamper testified in deposition that a paramount goal was maintaining security and avoiding violence. He testified, “I also need to emphasize that we had a crucial intersection blocked completely denying access of emergency vehicles and denying access to the WTO venue itself.... [Tjhose were formidable challenges bigger by far than anything, once again, that I had seen in the six years I had been here.... [0]ur concern is the violence could erupt on either side, that a delegate, for example, angered at being denied access could actually resort to violence, in this case, possibly armed violence.”

.Joiner testified in deposition that "the only recourse we had was to establish the [restricted zone] where we could provide security for the delegates and so forth.” Joiner also testified that "[w]e would not have allowed [peaceful protesters] to' stay [within the restricted zone] under the circumstances be- . cause we couldn’t- — we could not be assured that the demonstration would remain peaceful given the experience that we already had.”

. Appellants submitted the deposition testimony of Schell and Stamper in an attempt to establish that the City's purpose in adopting Order No. 3 was unlawful, in that the City implemented Order No. 3 with the purpose of eliminating protestors from the downtown area. But this evidence is consistent with the objective of Order No. 3 to eliminate all persons, with limited exceptions, from the downtown area. Even if plaintiffs could establish that the City had an illicit motive in adopting Order No. 3, that would not be dispositive. The Supreme Court has held unequivocally that it “will not .strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.” United States v. O’Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

. We also hold that Order No. 3 was not “viewpoint-based” on its face. Viewpoint dis- ■ crimination occurs “when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject.” Giebel v. Sylvester, 244 F.3d 1182, 1188 (9th Cir.2001) (internal quotation marks and citation omitted). Here, Order No. 3's ban on protests did not prohibit a particular viewpoint, and applied equally to persons who wished to protest about any topic. As in Hill, Order No. 3 "applie[d] equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries.” 530 U.S. at 723, 120 S.Ct. 2480.

. While the City was not required to choose the least restrictive alternative, an assessment of alternatives can still bear on the reasonableness of the tailoring of Order No. 3 and whether it was “narrowly tailored” as required. We have said that "if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the ‘fit’ between ends and means is reasonable.” City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); Edwards, 262 F.3d at 865.

. The district court was not required to accept the conclusion of Appellants’ declarant that the City’s only interest was to "transport the delegates to the conference.” That was not an accurate summary of the record before the district court. Nor in our analysis were we required to pretend as if the movement of delegates was the City’s only interest in the face of riot. The record before the district court showed widespread violence and the breakdown of civic order. On the undisputed facts before the district court, the City's interest in maintaining peace and order is fairly presented. The dissent's attempt to reduce the City’s interest to transporting delegates is wrong. Our analysis properly focuses on the City's interest when it enacted Order No. 3: restoring order and providing security to the core downtown area to protect the President, visiting world dignitaries, and the general public, and to allow the WTO conference to proceed.

.The dissent argues that our account of the breakdown in public order "does not paint a clear picture of the situation confronting City officials” because the protestors had left the core downtown area and the violence had subsided when Order No. 3 was implemented. Dissent at 1160. But there is no logical connection between an ■ assessment of the violence that occurred when WTO proceedings were ongoing and a temporary cessation of violence after WTO proceedings had concluded for the day. Even a fierce battle may experience a respite of calm, and the calm of an evening can precede a storm in the morning. The City was well aware that some protestors wanted to shut down the WTO conference by violent means and that the WTO conference was to resume the following day, and so there was a strong likelihood that more "organized violence of a serious nature [was] about to occur.” See Collins v. Jordan, 110 F.3d at 1363, 1373 (1997).
In any event, the dissent's claim, based on a single "sweep of the streets” at 8:00 p.m., that the streets of Seattle were "calm and under control” during the evening of November 30, *1132 Dissent at 1160, ignores the undisputed evidence. By 9:00 p.m., officers were in danger of being assaulted and injured by some aggressive protestors who held the advantage of Capitol Hill's higher ground. Ongoing skirmishes continued until 3:30 a.m., with officers fending off "rocks, bottles, golf balls, and ... incendiary devices.” WTO After Action Report at 42. Moreover, violent protestors had established a pattern of converging, protesting, and then dispersing only to reassemble later at another location. Id. at 35. Given the violent protestors' aim to shut down the WTO conference and their pattern of conduct, a realistic depiction of events in the record is that the violence had "temporarily subsided” during the evening of November 30, not that the violence had "ended,” as the dissent maintains. Even crediting Appellants' evidence and giving all reasonable inferences to the Appellants, as we must under the summary judgment standard, the record does not permit a rational conclusion that the City should have thought the .violence "ended.”

. This interest is embraced within the City’s asserted interest in restoring order and maintaining security, which are necessary for public safety, effective commerce, and the vitality of the City.

. The Menotti plaintiffs and the Hankin plaintiffs argue that Order No. 3 was not narrowly tailored because the restricted zone was too large, and because the restricted zone banned protected forms of speech. In addition, the Hankin plaintiffs argue that the City should have "expend[ed] the effort necessary to ensure clear passage for the delegates to and from the [WTO conference] venues without infringing unnecessarily on protestors’ rights.”

. We are concerned here with the effect that the large number of peaceful protestors had on the ability of police to quell the significant criminal acts of the violent protestors. The impeding or "buffer” effect of peaceful protestors is undisputed on the record.

. The Hankin plaintiffs contend that "[t]here was no attempt to preserve lawful protest and arrest only those who broke the law, just an attempt to ban all protest.” But the record does not support that argument. The restricted zone created by Order No. 3 was implemented only after a full day of protests on November 30, 1999. Before the implementation of Order No. 3, protestors had been allowed in the downtown area, resulting in the City's police force being overwhelmed, as well as significant damage and disruption to the downtown area. If the Hankin plaintiffs contend that there was no attempt to preserve lawful protest on December 1, 1999, then that *1133 too is belied by the record. Protestors were allowed access to streets immediately adjacent to the delegates' hotels and conference sites. There was not a total bar to protest, and the scope of the restrictions must be tested under the legal standards identified above for time, place, and manner restrictions on speech.

. The Menotti plaintiffs also argue that Order No. 3 did not further a significant governmental interest because it permitted entry into the restricted zone of persons not engaged in protest. We disagree. There is no evidence that those permitted in the restricted zone were part of the problem addressed by Order No. 3. Persons who lived, worked, or had other business in the restricted zone could go about their business without impeding the City’s ability to maintain a secure environment in the restricted zone. Though Order No. 3 contained exemptions that allowed certain persons to enter the zone, it still furthered a significant governmental interest by excluding from the zone the protest activity that was a security threat to the downtown area.

. Appellants make much of a declaration submitted by a former law enforcement official, who contended that Seattle police should have used pedestrian tunnels and dedicated roadways to facilitate the movement of WTO delegates. Yet, these contentions do not address the fact that the tunnels in question did not connect all of the hotels and venues being used by WTO delegates. The suggestions in the declaration provide no practical way to stop the behavior of violent protestors in the downtown Seattle area on November 30, 1999. Moreover, Appellants’ alternatives were not a feasible means for the City to balance its interest in hosting the WTO conference with reliable safety for delegates, and the demonstrators' interest in expressive activity. See Kuba, 387 F.3d at 862 n. 12 (recognizing that suggested alternatives that are "far less restrictive and more precise means of regulating the time, place, and manner of speech” is just the first step in a "narrow tailoring” analysis, and that a court must also consider "whether the alternatives both are feasible and allow substantially more speech”). Even crediting Appellants’ declarations and giving all reasonable inferences to Appellants, we *1134 cannot say that the al'ternatives were a feasible means to respond to the prevalent violence that gravely threatened the security of the WTO conference and the peace and order of the City.

. That Order No. 3 protected a ‘'particular method" of getting WTO delegates to the conference does not mean, as the dissent argues, that this is the only "interest Order No. 3 actually served.” See Dissent at 1168 n. 7. As we have explained, Order No. 3 brought order and security to the core downtown area, providing safety for delegates and allowing the WTO conference to proceed as scheduled. See discussion supra at 1131-32.

. The dissent is wrong to characterize the City’s means as a "poor fit” with the City's interest based on the occurrence of violence outside the restricted zone. It is not required for our legal analysis that the City's measure to restore order where it was most needed had to maintain peace and security perfectly in all areas outside the restricted zone. The dissent’s argument that Order No. 3 was not narrowly tailored because it "did not protect anyone outside of the perimeter,” Dissent at 1171, ignores or minimizes the core interest addressed by Order No. 3: protecting the President and foreign dignitaries who came to Seattle to conduct the business of the WTO. The City needed to restore and maintain order in the core downtown area to achieve this interest, and Order No. 3 "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.” Frisby, 487 U.S. at 485, 108 S.Ct. 2495. We decline the dissent's suggestion that a city's means to achieve its significant interest of restoring and maintaining security can never be narrowly tailored absent a policy completely efficacious in eliminating violence. See, e.g., Ward, 491 U.S. at 800, 109 S.Ct. 2746 ("The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible deci-sionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests *1135 should be promoted.”) (emphasis added);, see also City Council v. Taxpayers for Vincent, 466 U.S. 789, 807-10, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding a ban on posting signs on public streets to achieve the significant public interest of "avoiding visual clutter” even though posted signs only "add somewhat” to the city's visual clutter).
Similarly, the dissent's argument that the restricted zone's size “allowed” violence to continue in areas outside the zone, Dissent at 1171, is unsupported by and contrary to the record, which places some officers and notes hundreds of arrests outside the zone. As the conference moved toward completion, and the situation calmed, police were able “to escort and monitor non-permitted demonstrations outside the perimeter in a manner consistent with permitted demonstrations.” WTO After Action Report at 45. Moreover, the district court correctly found that the City reasonably concluded in Order No. 3 that "the level of city disturbances and danger to persons and property [was] highest in those areas in which there are protests in the vicinity of World Trade Organization ('WTO') meetings.” Contrary to the dissent’s assertion, the perimeter did more than protect WTO delegates; Order No. 3 brought safety and security to the downtown area, protecting businesses, their employees, and the City’s citizens as well.

. The Menótti plaintiffs acknowledged that "the primary response of a municipality to crime should be to arrest the criminals," but faulted the City for "fail[ing] to put enough officers on the streets on November 30th to accomplish this task.” The Hankin’plaintiffs also criticized the City's police department plan for law enforcement, arguing that "common police tactics and planning would have provided a much more secure downtown without sacrificing speech. For example, it is common police practice to establish lines of defense around certain buildings before protestors arrive, [and] to have squads specifically intended to pursue violent individuals within crowds.”

. Appellants contend that, since there was a decrease in violence in the hours immediately prior to the imposition of Order No. 3, this statement means that here the City acted unlawfully in adopting Order No. 3. We disagree.
In Collins, we described the "limited violence and disorder” that had taken place as involving "a few injuries to people, none of them extensive or life-threatening. The prin *1136 cipal incidents involved property damage and appear to have been confined to an area of about four blocks.... [M]ost of the city was free from any form of unlawful conduct.” 110 F.3d at 1372. Here, the violence that had taken place was substantially more severe, involving assaults on police and WTO delegates, fires, medical emergencies, evacuation of retail stores, and a general loss of civic order. Moreover, Collins invalidated an order that banned all demonstrations throughout the whole county. In Seattle, however, protestors could still demonstrate in all City areas outside the restricted zone.
Collins does not hold that, when a city is confronted with violent, dangerous protests of the type in this case, it must wait for further violence to occur before taking measures to restore civic order. Despite the dissent’s characterization of Collins as involving “a similar emergency order adopted under analogous circumstances,” Dissent at 1169-70, we face a factually and legally distinguishable case, and the weight the dissent places on Collins again shows the dissent's minimization of the crisis in Seattle. See also supra note 34 (recognizing that, on the undisputed facts, the City had reason to believe and was entitled to believe that the violence attendant to the WTO conference had not ended prior to Order No. 3’s enactment, but had just temporarily subsided and would resume contemporaneous with WTO proceedings).

. San Francisco County has a land area of 47 square miles. United States Census Bureau, California Quick Facts, San Francisco County (2000), available at http://quick-facts.census.gov/qfd/states/06/06075.html (last revised Feb. 1, 2005).

. The dissent argues that we have allowed the constitutional framework "to be shaped” by our "characterization of the level of violence.” Dissent at 1169 n. 12. The dissent misunderstands our application of First Amendment doctrine, which assesses the means the City used in light of the ends the City needed to achieve. We have applied the correct legal framework established by the Supreme Court. See, e.g., Ward, 491 U.S. at 799, 109 S.Ct. 2746. Under this precedent, understanding the City's interest is essential to assessing whether Order No. 3 was narrowly tailored to achieve that interest. See, e.g., id. at 796-801, 109 S.Ct. 2746. Collins also recognized that a heightened city interest to end and prevent violence would require a different analysis:
Today, we decide only that the violence and disorder that occurred in San Francisco on April 30 falls far short of the type of occurrence that could have led any reasonable official to believe that it would be constitutional to impose a city-wide ban on all demonstrations, and that the law to that effect was clearly established.
110 F.3d at 1373. In our view, Collins does not dictate a conclusion that Order No. 3 is facially unconstitutional because Collins addressed a significantly broader restriction on speech enacted in response to a significantly less dire situation.

. The dissent views Grossman v. City of Portland, 33 F.3d 1200 (9th Cir.1994), as presenting a "similar problem.” Dissent at 1170-71. The dissent’s analogy to Grossman is off the mark, and reflects the dissent’s pervasive misapprehension of the scope of violence and disorder presented in Seattle by the WTO protests. Grossman addressed the City of Portland's permitting scheme as applied to a "small, peaceful anti-nuclear protest, involving six to eight people,” 33 F.3d at 1201-02, and is factually inapposite to this case which involved tens of thousands of protestors and hundreds of violent and lawbreaking ones.
In addition to being factually inapposite, Grossman’s reasoning is not persuasive in an analysis of whether Order No. 3 was a reasonable time, place, and manner restriction. Portland's permanent permitting scheme made it unlawful "for any person to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in a park without ... written permission.” Id. at 1204. Portland's stated interest was "protecting the safety and convenience of park users,” and "maintaining normal quiet in the area adjacent to or near the park.” Id. at 1205-06 & n. 11. We held this scheme facially invalid in part because the distinction between groups displaying messages and groups not displaying messages was "absolutely empty in terms of the ordinance's stated goals.” Id. at 1206-07. But Grossman did not hold or suggest that such a distinction is necessarily empty in all cases. Here, the record supports the City's distinction: The violence and disorder visiting downtown Seattle during the four days of the WTO conference was incident to the presence of protestors, not emergency personnel, business employees, or shoppers. Grossman in no way controls, and is not persuasive on, the constitutionality of a city's necessary but temporary response to a breakdown of civic order in an emergency setting. Grossman did not involve such a breakdown in order and is of no help in assessing the City of Seattle's proper response to a crisis that threatened the safety of Seattle's visitors and citizens.

. The dissent incorrectly refers to our assessment of the City's interest as “confused and inconsistent” because we list the following: "protecting the president and foreign dignitaries,” "maintaining public order,” “providing security to the core downtown area,” and "seeing that the WTO delegates had the opportunity to conduct their business.” See Dissent at 1167 n.6. A rational evaluation of our discussion of the City's interest, however, yields a common thread: restoring and maintaining order to the core downtown area so *1138 that the WTO conference could proceed safely and securely.
Again, it is incorrect to urge that a city’s means of restoring order is not narrowly tailored because the city has not fashioned a remedy aimed at completely eliminating disorder across the entire city. See supra note 42. For Order No. 3 to be narrowly tailored, Supreme Court precedent requires only that it target and eliminate “no more [as opposed to no less] than the exact source of the 'evil’ it seeks to remedy.” Frisby, 487 U.S. at 485, 108 S.Ct. 2495. The City was entitled to seek a remedy in its core area where WTO delegates resided and worked.

. It cannot sensibly be argued that protesting outside the restricted zone was not a viable alternative on the mistaken theory that the delegates were not as accessible from that position. The Supreme Court has instructed that the First Amendment does not require that individuals retain the most effective means of communication, only that individuals retain the "ability to communicate effectively.” Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. 2118; see also Hill, 530 U.S. at 729, 120 S.Ct. 2480 (upholding a law that prohibited individuals from having a position that maximized accessibility to the target of their speech).

. The district court also held that Order No. 3 provided ample alternative means for communication because protestors "had access to the media and to the public beyond the zone.” The First Circuit recently expressed a similar view in resolving a challenge to a demonstration zone established by the City of Boston for the 2004 Democratic National Convention. Bl(a)ck Tea Soc'y, 378 F.3d at 14. The First Circuit held that the demonstration zone provided ample alternative channels for communication because "[a]t a high-profile event, such as the [Democratic National] Convention, messages expressed beyond the firsthand sight and sound of the delegates nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets.” Id. Because we hold that there is no constitutional requirement that protestors be allowed to reach their designated audience in the precise manner of their choosing, we do not evaluate this alternative argument.

. In Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), Justice Brennan wrote for the Court, ”[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. Punishing desecration of the flag dilutes the very freedom that makes this emblem so revered, and worth revering.” Justice O’Connor has also remarked that “[t]he hallmark of the protection of free speech is to allow 'free trade in ideas' — even ideas that the overwhelming majority of people might find distasteful or discomforting.” Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

. Though the singular importance of these First Amendment values could hardly be overstated, it also must be kept in mind that the First Amendment was held to be applicable against the States, and here a local government, through the Fourteenth Amendment’s Due Process Clause. De Jonge, 299 U.S. at 364, 57 S.Ct. 255; see also Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), (incorporating the First Amendment's protections into the Fourteenth Amendment's Due Process Clause on the view that the First Amendment's protections were “implicit in the concept of ordered liberty”), ovenuled on other grounds by Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

. The dissent challenges our practical recognition of the emergency confronting the City and our pragmatic application of the ample alternatives test as lacking affirmative prece-dential sanction. See Dissent at 1174. Our resolution of this issue is not contrary to established law and reflects the principle that tbere is no constitutional right to deliver a confrontational message of protest directly to an intended target. See Hill, 530 U.S. at 716-18, 120 S.Ct. 2480 ("[W]e have continued to maintain that 'no one has a right to press even "good” ideas on an unwilling recipient. ... While the freedom to communicate is substantial, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate.” ’ ”); see also Bl(a)ck Tea Soc’y, 378 F.3d at 14 ("[A]l-though the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.”).
The dissent’s unsupported assertion that Hill is inapposite because WTO delegates were not "particularly vulnerable” and faced only "the unpleasantness or inconvenience of a large demonstration,” see Dissent at 1167 n.6, understates the danger visiting delegates *1141 faced from violent protestors determined to derail the WTO conference.

. Some protestors may have preferred the restraints of Order No. 3 as an aid to their own safety, as well as that of delegates. However, for purposes of assessing the constitutionality of Order No. 3, on the dueling summary judgment motions, we may assume that protestors generally disfavored the restraint, and had views similar to those Appellants have asserted.

. The record is void of evidence supporting the dissent's argument that WTO delegates could see and hear protestors only within the 25-square block restricted zone. See Dissent at 1173. Reason and precedent belie this proposition. See Hill, 530 U.S. at 718, 120 S.Ct. 2480 (holding that protestors had ample alternatives to communicate their message even if they could not communicate with their intended audience where they preferred).
The dissent, most likely recognizing the lack of evidence to support its argument, argues that "neither does the record reflect that the delegates could see and hear protestors, or that the alternative means of communication available to the protestors were sufficient." Dissent at 1173 n. 16. But contrary to the dissent's assertion, the undisputed facts in the record show that per the terms of Order No. 3 protestors could communicate their views directly outside most of the hotels where delegates were staying. See apps. A & B (showing that Order No. 3's boundary bordered delegates’ hotels); WTO After Action Report at 46 (recognizing that protestors demonstrated at the front door of the Westin Hotel). The ability to so communicate is shown by appendices A and B. It is not disputed that major venues for delegates, as identified on the appendices, included the Four Seasons Olympic, Cavanaughs, the Sheraton, and the Westin hotels. Of these, the Four Seasons Olympic, Cavanaughs, and the Westin were located on the border of the restricted zone. Thus, the appendices show* without inference that Order No. 3 did not restrain protestors from making their views known on Foúrth Avenue and on ' Sixth Avenue outside the restricted zone across the street from three of the four identified major venues for delegates situated in the restricted zone; only the Sheraton Hotel is not on the restricted zone's border. Consistent with Order No. 3 is the declaration of protestor Michael Gendler, submitted by the Appellants, which confirms that protest was allowed on the east side of Fourth Avenue. The appendices show that the east side of Fourth Avenue is adjacent to both Cava-naughs and the Four Seasons Olympic hotels. Order No. 3 on its face imposed no limitations on expressive activity outside the restricted zone. See also WTO After Action Report at 45 (noting a "group of about 1,000 people” that marched southbound on Fourth Avenue). We draw no inferences in favor of our factual statement; rather, the dissent ignores the undisputed facts that do not fit its legal theory.
Moreover, according to the undisputed declaration of Assistant Chief Clark Kimerer, *1142 there were "several downtown hotels not within the buffer zone housing WTO delegates which were excluded" because police believed they could "provide adequate security.” It is also undisputed that thousands of protestors did not abandon their demonstrations, but continued them throughout the rest of the downtown area for the duration of the WTO conference. Id. at 43-46.
These alternative means of communication taken together are sufficient as a matter of law under Supreme Court precedent because they gave a reasonable opportunity for protestors to communicate. See City of Renton, 475 U.S. at 54, 106 S.Ct. 925.

. We reject the City’s alternative contention that Order No. 3 was a permissible exercise of municipal control under a theory of an "emergency exception.” Citing to out-of-circuit cases, the City argues that Order No. 3 was valid because it was taken in good faith and there was a factual basis to decide that Order No. 3 was necessaiy to maintain order. See Smith v. Avino, 91 F.3d 105, 109-10 (11th Cir.1996), abrogated on other grounds by Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); United States v. Chalk, 441 F.2d 1277, 1280 (4th Cir.1971); Moorhead, v. Farrelly, 723 F.Supp. 1109, 1112-14 (D.Vi.1989). These cases are distinguishable, and the standard that they voice does not permit a sufficiently nuanced review of the First Amendment rights at stake here. Smith and Moorhead involved natural disasters that provided little or no warning to municipalities. While Chalk involved civil unrest, it was the result of an unpredictable clash between police and high school students, in contrast with this case, which involved a world trade conference planned months in advance. Also, these courts employed the emergency analysis in specific and limited contexts different from that here, the contexts of natural disasters or of civil unrest confined in a smaller area, and in each case the government’s tool was evening curfew. Our case involves political protest coupled with chaos and violence, followed by a restricted zone covering a large part of downtown Seattle, the core area including convention venues and delegates' hotels, with the restriction applicable, day and night, for the several remaining days of the conference. The legal analysis justifying nighttime curfew in the "emergency” cases is not controlling and does not permit adequate evaluation of the competing interests in the face of the crisis that was presented. See also Oren Gross, Chaos and Rules: Should Responses to Crises Always Be Constitutional?, 112 Yale L.J. 1011, 1027-42 (2003) (outlining several problems with doctrines of emergency powers). We decline to analyze Order No. 3 based on the "emergency” doctrine, though as we have explained above, the nature of the City's interest in security ¡and safety has been germane to our analysis of the test for a reasonable time, place, and manner restriction.

. At oral argument, the Hankin plaintiffs also contended that the City should have reevaluated and reduced or eliminated the restricted zone on December 2 or December 3, after the initial imposition of Order No. 3 on December 1 had decreased the violence taking place in Seattle. We do not consider this argument because it was not raised in the Hankin plaintiffs’ opening brief. Collins v. City of San Diego, 841 F.2d 337, 339 (9th Cir.1988) ("It is well established in this Circuit that claims which are not addressed in the appellant’s brief are deemed abandoned.”). Even if we were to address this contention, the facts in this case justify the continued imposition of the restricted zone. Although Order No. 3 had the effect of decreasing violence in Seattle on December 1, there was undisputed evidence that violence continued outside the restricted zone on December 2 and December 3, including an incident where protestors surrounded the King County Jail (resulting in a lockdown of the jail). Given the events that had taken place on November 30 and the ongoing violence from December 1 to December 3, the City was justified in maintaining the restricted zone to preserve order and security in the downtown area until the WTO conference concluded. The restriction here lasted only four days. Were we faced with such a restriction on public access over weeks or months, a duty to reevaluate surely would arise at some point. But here, the initial evaluation on December *1143 1, in light of the limited duration of the conference, is reasonably proximate to the duration of restraint.

. We also note that the district court exercised supplemental jurisdiction over Appellants' claims under the Washington State Constitution, and dismissed those claims on summary judgment. Viewing these claims as a facial challenge, we note that Washington interprets its free speech clause in its Constitution in a manner parallel to the federal Constitution’s First Amendment interpretation, except that Washington courts "diverge from the Supreme Court on the state interest element of the time, place, and manner test, as [the Washington courts] believe restrictions on speech can be imposed consistent with [the Washington Constitution's free speech clause] only upon showing' a compelling state interest.” Collier v. City of Tacoma, 121 Wash.2d 737, 854 P.2d 1046, 1051 (1993) (en banc). We hold that the City’s interest in restoring and maintaining safety and security also was a "compelling state interest" within the meaning of Washington law, because "the purpose [is] a fundamental one and [Order No. 3] bear[s] a reasonable relation to the achievement of the purpose.” See id. at 1054. Thus, we affirm the district court’s summary judgment dismissal of Appellants' challenge to the validity of Order No. 3 under the Washington State Constitution.

. The First Circuit recently rejected a similar argument in Bl(a)ck Tea Soc’y, 378 F.3d at 12.

.The dissent argues that Griefen is inappo-site because "the area into which the plaintiffs sought entry to protest had temporarily lost its status of public forum.” Dissent at 1175 n. 17. The dissent incorrectly reads Griefen, taking the sentence it relies upon out of context. In Griefen we said that "the immediate area of a construction zone is not an area that has the attributes of a public forum.” 200 F.3d at 1261 (emphasis added). We also held in Griefen that "[w]hen expressive conduct occurs on public grounds, like a national forest, the government can impose reasonable time, place, and manner restrictions,” id. at 1259-60 (emphasis added), and "[i]f a closure of a public forum is for a valid rather than a disguised purpose, the potential for self-imposed or government censorship ... does not exist.” Id. at 1262 (emphasis added). Moreover, we had "no doubt” in Griefen that "a government entity may close areas of public forests under construction and repair,” just as we had "no doubt” that a city "could temporarily close for good reasons ... a street engulfed in a riot or an unlawful assembly.” Id. at 1263.
The closure order we addressed in Griefen closed part of the Nez Perce National Forest, which doubtless is and was a public forum. In any event, in Griefen we analyzed not only the reasonable time, place, and manner issues, id. at 1259-62, but also the protestors' unbridled discretion challenge on the premise that the order closed a public forum. Id. at 1262-65. Similarly, our analysis in this case of the reasonable time, place, and manner issues raised by the Appellants proceeds on the premise that Order No. 3 closed a public forum. See discussion supra Part III.A. Likewise, our analysis of Appellants’ unbridled discretion challenge proceeds on the premise that Order No. 3 resulted in "a closure of a public forum [] for a valid rather than a disguised purpose.” See Griefen, 200 F.3d at 1259-60.

. The dissent appeals to Board of Airport Commissioners v. Jews for Jesus, 482 U.S. 569, 573, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), but that case is inapposite as it involved a speech restriction held to be facially unconstitutional under the First Amendment’s over-breadth doctrine. Moreover, Order No. 3 did not receive a "virtually open-ended interpretation,” but rather contained express limits on whom officers could exclude from the restricted zone, such as WTO personnel, workers, and public safety officials.

. The dissent intimates that any statute that gives an officer discretion to administer speech restrictions is unconstitutional because it provides "the opportunity for abuse.” See Dissent at 1175. Our dissenting colleague overstates the reach of the First Amendment’s unbridled discretion doctrine. A literal "opportunity for abuse” may be present whenever an armed officer of the law is given authority to enforce a speech restriction. We are concerned instead with whether Order No. 3’s contained "adequate standards to guide the official’s decision and render it subject to effective judicial review.” Chicago Park Dist., 534 U.S. at 323, 122 S.Ct. 775 (2002).

. The Menotti plaintiffs contended at oral argument that, under Hague v. Committee for Indus. Org., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), the fact that officers had any discretion to admit persons into the restricted zone rendered Order No. 3 and the Operations Order unconstitutional. We disagree. In Hague, the ordinance allowed a city official to deny a permit for a public meeting for any reason believed by the official to be "proper," provided that the denial was for the purpose of "preventing riots, disturbances, or disorderly assemblage.” Id. at 502 n. 1, 59 S.Ct. 954; see also Forsyth County v. Nationalist Movement, 505 U.S. 123, 133, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (holding that a county’s parade ordinance granted excessive discretion to a county administrator as to the proper amount to charge for a parade permit, where there were "no articulated standards either in the ordinance or in the county’s established practice” and the city administrator was "not required to rely on any objective factors” to determine the proper fee). These cases do not constitutionally prohibit the grant of any discretion to city officials. Rather, the cases hold that city officials must be guided by objective factors and standards when making decisions pursuant to a city ordinance that restricts speech. Here, officers were instructed to grant entrance into the restricted zone to those persons who had a "reasonable purpose” (defined to include “work, shopping at a specific location within the perimeter, or other like type reasonable activity”) to enter the zone. The Menotti plaintiffs' argument on this score is unpersuasive.

. The dissent argues that the Operations Order allowed "officers to determine unilaterally what constitutes a 'reasonable purpose,’ *1146 with no further elaboration on what might be considered 'other like type reasonable activity’ ” Dissent at 1176. The dissent’s selective quotation ignores the guidance provided by the enumeration of specific activities that constituted a "reasonable purpose,” such as working or shopping. That the Operations Order listed these commercial activities served to "guide the official's decision and render it subject to effective judicial review.” Chicago Park Dist., 534 U.S. at 323, 122 S.Ct. 775.

. In Kuba we addressed a facial and as-applied challenge to a state association’s policy that prohibited individuals from demonstrating at the association’s rodeo and circus, except in designated "free expression zones.” Kuba, 387 F.3d at 853-55. We held the policy facially unconstitutional because the association failed to prove how a handful of demonstrators would cause congestion or a danger to safety, see id. at 859-60, and because the association’s policy was not narrowly tailored when it penned demonstrators in "three small, fairly peripheral areas” and did not "sufficiently match” the interest of preventing congestion that could have been achieved with equal effectiveness but less speech-restrictive alternatives, see id. at 861-62. Kuba differs from the case before us because Kuba did not involve significant pri- or violence such as had marred Seattle. The corresponding governmental interest in Kuba, in preventing congestion with potential impact on safety, before the congestion occurred, was less than Seattle’s interest in restoring order, after widespread violence, including vandalism and riot.

. These declarations were submitted in support of the Menotti plaintiffs' motion for par *1148 tial summary judgment, and in opposition to the City's motion for partial summary judgment.

. Former-Police Chief Stamper also testified via declaration that “the action of the officers [administering the restricted zone] when confronted with that WTO slash through it ... was, you know, take the symbol away, put it in your backpack, or whatever the solution was to that particular problem.”

. As Order No. 3 was on its face a reasonable time, place, and manner restriction, it follows that all persons who did not enter or who were excluded from the restricted zone because of that order cannot assert a valid claim individually or as a class member. However, any persons who were excluded solely because of the content of their visible communications without regard to the exemptions within Order No. 3, or those such as employees and shoppers, who came within Order No. 3’s exemptions, but who were allowed to enter the restricted zone only after removing visible communications, such as buttons or stickers, hostile to the WTO, may assert an as-applied First Amendment claim. Their ability to assert a claim against the City, as contrasted with a claim against the specific officers with whom they interacted, will depend on the factual determination whether their claim is based on a policy of the City of Seattle, an issue on which we have identified a genuine issue of material fact requiring trial. As to any such claimants, we express no opinion whether the requirements for class *1149 action certification may be satisfied, leaving that issue for initial consideration in the district court after any due and appropriate proceedings.

. Seattle Municipal Code section 12A. 12.015 prohibits pedestrian interference. A person commits pedestrian interference where the person, inter alia, "intentionally obstructs pedestrian or vehicular traffic.” To “obstruct pedestrian or vehicular traffic” is defined as "to walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact." . Seattle Mun.Code § 12A.12.015.

. Seattle Municipal Code section 12A.16.010 prohibits obstructing a public officer. A person obstructs a peace officer where the person, inter alia, "[¡Intentionally and physically interferes with a public officer” or "[i]nten-tionally hinders or delays a public officer by disobeying an order to stop given by such officer.” Seattle Mun.Code § 12A.16.010.

. The parties dispute whether Sellman appeals the district court’s grant of summary judgment to Officer Stevens, the officer who arrested Sellman. Sellman's only reference to Officer Stevens in his opening brief was a statement that "[s]ummary judgment should be entered in Sellman's favor, with remand to determine the damages caused by the City, Schell, Stamper, and Stevens.” Because this contention was not supported by argument in Sellman's opening brief, we deem it waived. Humble v. Boeing Co., 305 F.3d 1004, 1012 (9th Cir.2002) ("Issues raised in a brief but not supported by argument are deemed abandoned absent manifest injustice.”); see also Fed. R.App. P. 28(a)(9)(A) (requiring that appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies”).

. In his complaint, Skove alleged that Order No. 3 was unconstitutional as applied to him, and that Officer Smith violated Skove’s First Amendment and Fourth Amendment rights in seizing Skove's sign. Skove did not allege in his complaint that the City was liable under a theory of municipal liability for an alleged Fourth Amendment violation stemming from Smith’s seizure of his protest sign.

. Exceptions to the warrant requirement, for example, include administrative searches, Donovan v. Dewey, 452 U.S. 594, 598, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), searches incident to arrest, see United States v. Edwards, 415 U.S. 800, 802-03, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), automobile checkpoint searches, see Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), reasonable detention of suspects during the execution of a search warrant, see Michigan v. Summers, 452 U.S. 692, 702-05, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), limited searches for weapons based on reasonable suspicion, see Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and exigent circumstances, see United States v. Place, 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). We have defined exigent circumstances to include "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc).

. Smith argues that Skove voluntarily abandoned Skove's interest in the sign when he walked away from Smith after the seizure. This argument misses the point. The sign was seized before Skove walked away. The lawfulness of the seizure had to be shown based on evidence existing before or at the time of the seizure. Skove’s departure after the sign's seizure is not material on this score.

. Skove contends that he is entitled not only to reversal of the summary judgment given Smith, but also to a grant of summary judgment establishing Smith's liability for the seizure of Skove’s sign. On this requested summary relief for Skove, we view the evidence in the light most favorable to Smith, rather than as we have viewed it above most favorably to *1155 Skove. Smith testified by declaration that when he seized Skove's sign he intended to “detain Mr. Skove to determine whether he was authorized to be in the zone.” Smith also said in his declaration that “[g]iven the nature and extent of the protests in the area and my assignment, I decided not to pursue Mr. Skove to detain him or arrest him for violating [Order No. 3] and ignoring my directives.” Viewing the evidence in the light favorable to Smith, we conclude that there are genuine issues of material fact whether the circumstances at the time and place of the seizure showed sufficient exigency to justify warrantless seizure. See, e.g., McConney, 728 F.2d at 1199. The factual issue of exigency must be presented to a trier of fact.

. Justice Stewart's quoted observation was made in the context of the Court’s decision restricting protest on a military base. The same idea, however, animates the permissibility of reasonable time, place, and manner restrictions on protest in a public forum.